[No. 12067-8-III.    Division Three.    January 4, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. OSIEL
SUAREZ-BRAVO, *Appellant.*

360

*Keith W. Howard*, for appellant.

*Gary A. Riesen, Prosecuting Attorney*, and *Douglas J. Shae, Deputy*, for respondent.

SWEENEY, J. — On July 26, 1991, Osiel Suarez-Bravo was charged by information in Chelan County with one count of unlawful possession of a controlled substance (cocaine) with intent to deliver. A jury found him guilty. He appeals, contending that by a combination of evidentiary error and prosecutorial misconduct he was denied a fair trial.

The State's motion on the merits was denied. After review of the complete record, we are convinced that Suarez-Bravo did not receive a fair trial and reverse.

FACTUAL BACKGROUND

David Palmer, a paid undercover informant with the Chelan County Sheriff's office, and Detective Jeff Middleton testified that between July 18 and 22, 1991, they attempted to make drug purchases in and around the city of Chelan. In furtherance of this effort, Palmer negotiated with Alejandro (Alex) on July 22 to purchase 8 ounces of cocaine for $6,000. A plan was formulated by Detective Middleton to make the buy that evening and a team of officers was assembled for that purpose. Alex accompanied Palmer and Detective Middleton to await the purchase, but the sellers failed to appear. Detective Middleton was left at the Chelan Pharmacy to

wait. Alex then directed Palmer to drive to Suarez-Bravo's apartment on Columbia Street. Alex went to the door of the apartment and returned within a couple of minutes. Palmer and Alex then returned to Detective Middleton's location at the pharmacy.

Some time later, Suarez-Bravo pulled up to the pharmacy alone in a gold Thunderbird. Palmer testified that he entered the passenger side of that vehicle and asked Suarez-Bravo to show him what he had brought. Suarez-Bravo then reached under the seat and produced a large plastic bag, containing six or seven smaller ounce-size baggies, which later proved to contain about 6 ounces of cocaine. Palmer showed one of the baggies to Detective Middleton and then went to the trunk of his own vehicle, ostensibly for money. By opening his trunk, Palmer signaled nearby backup officers who then arrested Alex and Suarez-Bravo.

At trial, Detective Middleton positively identified Suarez-Bravo as the person who arrived in the Thunderbird and handed the cocaine to Palmer. Deputies Eugene Ellis and William Petrycki, both of whom responded to the bust signal, also had no doubt that Suarez-Bravo was the man who made the delivery; a uniformed backup officer, Michael Simmons, agreed.

Suarez-Bravo's wife, Claudia Sota, testified that a man came looking for her husband about midnight on July 22 to get his car "jump started". Her husband then left and she went back to bed. She admitted her husband's car was a gold-colored Thunderbird, but denied knowledge of any cocaine in the car or their apartment.

Suarez-Bravo testified that two men, Alex and Roberto, came to his apartment asking for work earlier in the evening of July 22 and asked if one of the men could sleep in Suarez-Bravo's car; he agreed. At about 11:30 p.m., Suarez-Bravo was awakened when Alex asked for a jump start because the battery in his station wagon was dead and he had been forced to leave the station wagon at the "clinic" parking lot. Suarez-

Bravo and Alex went to the pharmacy parking lot looking for the station wagon. When they arrived, Alex got out of the car and another man (Palmer) approached. Alex then told Suarez-Bravo to give him the bag that Roberto had left under the seat. After Suarez-Bravo reached under and removed the bag, Palmer asked him what it was and how much there was. Suarez-Bravo said he did not know. Alex said it was 6½ ounces; Palmer took the bag and asked Alex how much it cost. Palmer then went to his car and opened the trunk, which signaled the arrest. Suarez-Bravo denied any knowledge of the contents of the bag.

At trial, the prosecutor asked Suarez-Bravo, "These Columbia Apartments happen to be an area where a lot of crimes are committed; isn't that true?" Defense counsel objected on the basis of relevancy and lack of foundation. The court ruled, "I suppose you can inquire as to whether or not he knew of the number of crimes in the area in which he lived." The exchange then continued:

Q: Well, it's true, isn't it, that there are lots of crimes in this particular area of the apartments?

A: Well, crimes — I don't know. What kind of crimes are you talking about?

Q: Well, in fact, there have been people selling cocaine out of those apartments before; isn't that true?

A: Well, as far as I know, no, because there was talk that somebody in No. 5 was selling, but I never realized because I don't buy it and I don't use it. Those people that sell it are very discreet; and if they see that you aren't interested, they don't tell you that they're selling.

Suarez-Bravo denied knowing what was in the bag and claimed he had been trapped.

The prosecutor then established that Suarez-Bravo was a noncitizen who feared deportation for this crime. He continued:

Q: You say that you worked in the orchard business for about 16 years; is that correct?

A: Well, I have worked more than 16 years, but it's been 16 years that I've worked here the whole time.

Q: Okay. You say you work with Hispanic people?
A: With Hispanics and Americans, even Salvadorians, Guatemalans and Nicaraguans.
Q: You've worked in the orchard business for 16 years off and on, and you have never seen cocaine before?
A: In my orchard where I worked I have never seen any of that.

The prosecutor later asked:

Q: And you also said that this person who is seated next to me is the person that went back to the trunk?
A: Yes.
Q: Are you saying that this person was the person that opened the trunk?
A: Yes, he's the one that opened the trunk because the other guy got out to grab me.
Q: So when he said that he didn't open the trunk, you're saying that he's not telling the truth; is that correct?
A: I didn't say that.
Q: Well, he testified yesterday that the fat man, as you said, opened the trunk; and you're saying that that is not true?
A: I didn't say the fat man opened the trunk.
Q: No? You said he opened the trunk.
A: Yes, I said he opened the trunk.
Q: And he said he didn't.
A: Well, he did it.
Q: So you're saying that he's not telling the truth?
A: Well, I'm not saying that he doesn't tell the truth, but he's the one that opened the trunk, and the other guy grabbed me.
Q: Okay. Do you recall this officer asking you if you had the six and-a-half ounces?
A: No, because that man didn't come up to me until they arrested us.
Q: Okay. Do you recall the other person, the fat man as you say, Mr. Palmer, who testified yesterday saying to you, "Do you have the coke?"
A: Well, I wasn't the one. Alejandro — He asked Alejandro how much cocaine it was, and I said I didn't know anything about it.
Q: Now, the officer said that you said that yes, you did have the six and-a-half ounces. You're saying that he's lying.
A: I'm not saying he's lying. I'm saying the one he asked was Alejandro, not me.
Q: He said he asked you.
A: I'm sure he didn't ask me because I couldn't tell him anything about that because I didn't know anything about that.

Q: So what the officer has testified, this officer and Mr. Palmer testified to yesterday, which differs from what you're testifying today, you say that they are telling a lie?

A: I can't say it's a lie, but I can't say it's the truth, either, about something they didn't ask me.

The defense made no objections during this testimony. On redirect, defense counsel reaffirmed with Suarez-Bravo that his story was the truth.

Another defense witness, Roger Williams, vouched for Suarez-Bravo's truthfulness and honesty. Williams, an orchardist, had employed Suarez-Bravo as foreman for about 4 years and thought highly of him.

The jury convicted Suarez-Bravo as charged. This appeal followed.

### RELEVANCY OF APARTMENT IN "HIGH CRIME AREA"

Suarez-Bravo contends the prosecutor's questions regarding the level of crime in Suarez-Bravo's apartment building were irrelevant and prejudicial in the prosecution of a crime which took place far from the apartment.

■ ER 401 defines "relevant evidence" as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Even a minimal logical relevancy is adequate if there exists a reasonable connection between the evidence and the relevant issues. *See State v. Bebb*, 44 Wn. App. 803, 814, 723 P.2d 512 (1986), *aff'd*, 108 Wn.2d 515, 740 P.2d 829 (1987). But irrelevant evidence is not admissible. ER 402. A trial court's decision regarding relevancy is discretionary and may be reviewed only for abuse of that discretion. *State v. Swan*, 114 Wn.2d 613, 658, 790 P.2d 610 (1990); *cert. denied*, 498 U.S. 1046 (1991).

■ The transaction here took place in a pharmacy parking lot, away from Suarez-Bravo's apartment. Whether his apartment building is in a high crime area has no logical relevancy to any element of the charge against Suarez-Bravo. At trial, the State explained it wanted to show how unusual it was for Suarez-Bravo to allow strangers to come to his door. But

another more probable and troublesome inference is that Suarez-Bravo was more likely to have committed the crime charged because he lives in a building where other crimes are committed. The evidence therefore smacks of prohibited profile evidence, particularly when viewed in light of the other examination of Suarez-Bravo by the State during this trial. "[T]estimony of criminal profiles is highly undesirable as substantive evidence because it is of low probativity and inherently prejudicial." *United States v. Gillespie*, 852 F.2d 475, 480 (9th Cir. 1988).

Even if the evidence were relevant, it is questionable whether the probative value would outweigh its prejudicial impact. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by . . . needless presentation of cumulative evidence." ER 403.

The State contends that Suarez-Bravo waived the error by failing to make a sufficient objection. We disagree. His initial objections on the basis of relevancy and lack of foundation were overruled. Generally, objections must state specific grounds so that the court is informed and the opposing party has an opportunity to correct the error. *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74, *review denied*, 118 Wn.2d 1007 (1991). Here, the objections covered the relevancy of the prosecutor's line of questioning and adequately informed the trial court of the basis for the claim of error.

## Prosecutorial Misconduct

Suarez-Bravo next contends the prosecutor's repeated attempts to have Suarez-Bravo call the State's witnesses liars constitutes prosecutorial misconduct. He asserts that, when combined with the questioning about the apartment, the error was not harmless and resulted in denial of a fair trial.

In order to establish prosecutorial misconduct, the defendant must show misconduct and resulting prejudice. *State v. Smith*, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985); *State v.*

*Stover*, 67 Wn. App. 228, 230, 834 P.2d 671 (1992), *review denied*, 120 Wn.2d 1025 (1993). Cross examination intended to compel a defendant to call police witnesses liars constitutes prosecutorial misconduct. *State v. Padilla*, 69 Wn. App. 295, 299, 846 P.2d 564 (1993); *State v. Smith*, 67 Wn. App. 838, 846, 841 P.2d 76 (1992); *State v. Barrow*, 60 Wn. App. 869, 875, 809 P.2d 209, *review denied*, 118 Wn.2d 1007 (1991). Asking a witness to judge whether or not another witness is lying invades the province of the jury. *Casteneda-Perez*, at 362. Further,

> it is readily conceivable that a juror could conclude that an acquittal would reflect adversely upon the honesty and good faith of the police witnesses.
>
> . . . .
> . . . It is for these reasons that most courts that have addressed the problem . . . have condemned the practice and will not permit it.

*Casteneda-Perez*, at 360, 363.

Here, not only did the prosecutor repeatedly attempt to get Suarez-Bravo to call the police witnesses liars, but he also misrepresented the testimony of those witnesses in order to create a conflict which did not exist. Palmer had testified he went to the trunk of his car; he never stated whether he opened the trunk. Detective Middleton testified Palmer opened the trunk, which signaled the arrest to other officers in the area. When Suarez-Bravo corroborated Detective Middleton's testimony that Palmer opened the trunk, the prosecutor asked Suarez-Bravo if that meant Palmer was not telling the truth. Contriving this conflict on the collateral matter of opening the trunk was inappropriate.

■ Prosecutorial misconduct requires reversal only when there is a substantial likelihood the jury's verdict was affected. *Barrow*, at 876; *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986); *State v. Stith*, 71 Wn. App. 14, 19, 856 P.2d 415 (1993).

> Some of the factors considered in determining whether the misconduct likely affected the verdict are whether the prosecutor was able to provoke the defense witness to say that the State's witness must be lying, whether the State's witness's testimony was believable and/or corroborated, and whether

the defense witness's testimony was believable and/or corroborated.

*Padilla*, at 301.

However, when the defendant has failed to either object to the impropriety at trial, request a curative instruction, or move for a mistrial, reversal is not required unless the misconduct was so flagrant and ill intentioned that a curative instruction could not have obviated the resulting prejudice. *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988). *See also State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991); *Stith*, at 20. In other words, if the misconduct cannot be remedied and is material to the outcome of the trial, the defendant has been denied his due process right to a fair trial. *State v. Davenport*, 100 Wn.2d 757, 762-63, 675 P.2d 1213 (1984).

■ Suarez-Bravo did not object, request an instruction or move for a mistrial. The question then is whether the prosecutor's misconduct was sufficiently flagrant to relieve Suarez-Bravo of the obligation to request a curative instruction. In making this determination, we consider the cumulative effect of (1) the questions concerning Suarez-Bravo's neighborhood, his Hispanic co-workers, his fears of deportation, and his status as a Hispanic noncitizen, as well as (2) the prejudicial nature of the prosecutorial misconduct.

The central factual issue at trial was whether Suarez-Bravo knew that the bag he pulled from under the car seat contained cocaine. His defense was that he did not know what was in the bag. His credibility was therefore at issue. The prosecutor's irrelevant line of questioning did not directly rebut Suarez-Bravo's credibility; rather, it called into question his reliability as a Hispanic living in what the State believed was a high-crime neighborhood, and working as a farm laborer (with the implication that the presence of cocaine is not unusual). This plus the clearly improper attempts to induce Suarez-Bravo to call the State's witnesses liars rises to the level of flagrant misconduct.

■ The prosecutor has a duty to see that an accused receives a fair trial. *State v. Charlton*, 90 Wn.2d 657, 664-65,

585 P.2d 142 (1978) . In the interests of justice, a prosecutor must act impartially, seeking a verdict free of prejudice and based upon reason. *Charlton,* at 664.

The police work here was competent and professional. The evidence gathered may well have been sufficient to convict Suarez-Bravo, but there exists a substantial likelihood that the jury's verdict was affected by the State's examination regarding Suarez-Bravo's residence, job and ethnic heritage.

The conviction is reversed and the case remanded for trial.

THOMPSON, C.J., and MUNSON, J., concur.