77 P.3d 681 (2003)
STATE of Washington, Respondent and Cross Appellant,
v.
Verne McLean HUGHES, Appellant and Cross Respondent.
No. 27340-3-II.
Court of Appeals of Washington, Division 2.
October 14, 2003.
Reconsideration Denied November 18, 2003.
*682 Mark Ellis Beam, Richard Alan Melnick, Clark County Prosecutors Office, Vancouver, WA, for Respondent.
R.A. Lewis, Attorney at Law, Camas, WA, for Appellant.
HOUGHTON, P.J.
Verne Hughes appeals his second degree felony murder conviction based on the predicate offense of second degree assault or attempted second degree assault. He argues that the trial court erred in admitting evidence and in instructing the jury, insufficient evidence supported his conviction, he received ineffective assistance of counsel, and that the prosecutor committed misconduct. We hold that the trial court did not err, the prosecutor did not commit misconduct, and that Hughes received effective assistance of counsel.[1]
Hughes also argues that his conviction be overturned in light of In re the Personal Restraint of Andress, 147 Wash.2d 602, 56 P.3d 981 (2002), amended and reconsideration denied (2003). We agree that Andress compels us to vacate Hughes's judgment *683 and sentence on second degree felony murder. We remand to the trial court with instructions to enter a verdict of second degree assault and for resentencing.

FACTS
In April 1999, someone stole David Ambrose's motorcycle. Ambrose suspected several individuals' involvement in the theft. To investigate, Ambrose, Hughes, and Lester Berry went to Randy Myers's home. Myers was in the garage with some friends, including Rocky Warner, when Ambrose entered the residence carrying a baseball bat. Ambrose and Myers argued.
During the encounter, Myers noticed Berry brandishing a firearm. Berry later testified that Hughes carried a gun that night. The group left Myers's home after approximately five minutes.
Next, Ambrose, Berry, and Hughes went to Larry Ward's home. Ambrose and Hughes entered the house, while Berry stayed outside. After a few minutes, Hughes and Ambrose left the house accompanied by Ronald McComb. Ambrose and Hughes asked McComb about the motorcycle while they drove back to the Free Souls Motorcycle Clubhouse. McComb lived in a trailer on the clubhouse property.
After the group arrived at McComb's trailer, Berry left. According to Hughes, Ambrose started hitting McComb's legs and head with the baseball bat. McComb tried to run, but Hughes waylaid him.
McComb asked Ambrose to stop hitting him so he could "catch [his] breath" and tell Ambrose about the stolen motorcycle. V-B Report of Proceedings (RP) at 781. At that point, Hughes walked back to the clubhouse to get a drink and to ensure that no one entered McComb's trailer. He returned about one-half hour later and saw McComb's dead body outside the trailer.
Vern Griffin, who lived in a trailer near McComb's, approached Ambrose, along with Hughes. Griffin lent Ambrose his truck to dispose of the body. Hughes helped Ambrose load McComb's body into the truck and find a place to dispose of it. The two drove to several areas and finally dropped the body down an embankment near a lumber yard. They left McComb's handgun in a dumpster, cleaned the back of the truck, and discarded Ambrose's baseball bat.
On July 13, 2000, Portland law enforcement officers arrested Hughes on an outstanding warrant for failure to appear. Officer Martin Schell, the primary investigating officer at the scene, read Hughes his Miranda[2] rights. After Schell finished, Hughes remained silent. Schell did not inquire further. Hughes asked another officer, Steven Andrusko, to cite him on his warrant violation. Hughes then offered information to the police about a Clark County homicide.
Schell contacted Portland Police Detective George Young regarding Hughes's offer to divulge information about a death. Young contacted Clark County Detective Kevin Harper regarding this information.
Harper and Young interviewed Hughes after advising him of his constitutional rights. Hughes indicated that he understood his rights and then spoke with the detectives. Hughes emphasized that he did not want to go to jail and that if he became a witness, it would be dangerous for him in jail. The detectives made no promises, but assured him that if he did go to jail, he would not be in the "general population." I RP at 66. Hughes also asked the detectives to help him locate his children. Harper agreed to help Hughes.
The detectives interviewed Hughes for approximately 45 minutes and then conducted another tape-recorded interview during which Hughes gave details about McComb's death. Harper again advised Hughes of his constitutional rights during the taped interview. Hughes stated that he hoped for something less than a homicide charge, such as manslaughter, in return for his statements.
*684 The detectives did not promise him anything and released him.
Harper later testified that he wanted Hughes to "stay cooperative" and that he wanted to follow Hughes's movements. II-B RP at 208. He felt that he did not have probable cause to arrest Hughes because McComb's body had not been found.
Harper arranged for a hotel room for Hughes and gave him about eight dollars. Harper did not ask for any information in exchange for the room and money.
Harper contacted Hughes several times after July 13, 2000. On July 14, Hughes showed the detective a possible location of Ambrose's baseball bat. On July 15, Harper again visited Hughes to gain more information about the homicide. On July 16, Harper helped Hughes release his car from police impound at no charge.
On July 18, Harper met Hughes and his ex-wife, Tina Burns, at her apartment. Accompanied by Hughes's wife, the detective stayed at the apartment for approximately one hour. Harper and Hughes discussed computer problems and the detective invited Hughes to church. Harper's wife begrudgingly accepted a gift from Hughes's ex-wife.
During the course of the investigation, Hughes told the detective that he was thinking of purchasing a particular handgun. Hughes asked Harper to determine whether the gun was stolen, and Harper complied by checking the police database.
On July 25, the police located McComb's body. On July 30, Harper contacted Hughes at an Oregon highway rest stop. Harper was again accompanied by his wife, who remained in the car. Hughes agreed to ride with Harper to the Clark County police station for a video-taped interview.
Back in Vancouver, Hughes gave a one-and-one-half-hour video-taped interview after the detectives advised him of his Miranda rights. The interview concluded with Hughes joking that the police had promised him lunch in exchange for his testimony. After the interview, the police arrested Hughes for McComb's murder. He became emotional because he felt he was "lied to, misled, and or betrayed." Clerk's Papers (CP) at 190.
Before trial, Hughes moved to suppress his statements under CrR 3.5.[3] In written findings of fact and conclusions of law, the trial court denied the motion to suppress statements Hughes made between July 13 and July 16, because they were not the product of implied promises or deception. The trial court then determined that the statements made after July 16 resulted from implied promises and suppressed them.
A jury convicted Hughes of second degree felony murder and he appeals.

ANALYSIS

Suppression
Hughes first contends that the trial court incorrectly found that no implied promises or deception produced his July 13 to July 16, 2000 statements. He asserts that a deceptive and coercive environment existed throughout the entire investigation, rendering all his statements involuntary.
We review a trial court's ruling on a CrR 3.5 motion by examining whether substantial evidence supports the challenged findings and whether those findings support the trial court's conclusions of law. State v. Ross, 106 Wash.App. 876, 880, 26 P.3d 298 (2001), review denied, 145 Wash.2d 1016, 41 P.3d 483 (2002).
We treat unchallenged findings of fact as verities on appeal. State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994). Substantial evidence is that which persuades a fair-minded, rational person of the finding's truth. Hill, 123 Wash.2d at 644, 870 P.2d 313. The fact finder measures witness credibility, and we do not review this determination on appeal. State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990).
Hughes asserts that Harper deceived him by direct or implied promises and the trial *685 court should not have admitted his statements because the police obtained them through improper influence. But Hughes misplaces his reliance on State v. Setzer, 20 Wash.App. 46, 49, 579 P.2d 957 (1978) (quoting Bram v. United States, 168 U.S. 532, 542-43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)).
Our Supreme Court has held that the voluntariness tests set forth in Setzer and Bram are incorrect.[4]State v. Broadaway, 133 Wash.2d 118, 132, 942 P.2d 363 (1997). The trial court must look to all circumstances to see if the statements were coerced. The court can consider any promises or misrepresentations made by the interrogating officers, but it must decide whether there is a causal relationship between the promise and the statements. Broadaway, 133 Wash.2d at 132, 942 P.2d 363. Thus, we determine whether the detectives' behavior overbore Hughes's will to resist and induced a "not freely self-determined" confession. Braun, 82 Wash.2d at 161-62, 509 P.2d 742.
The trial court found that the two July 13, 2000 interviews and other statements given up to July 16 were admissible because Hughes "made a knowing, voluntary and intelligent waiver of his rights and after July 13, 2000 he was not in custody." CP at 190. The court also found that after the police released his car on July 16, Hughes's later statements were made in a coercive atmosphere, requiring suppression.
Hughes challenges the court's finding that "on July 13, 2000, no promises, threats or other improper inducements were offered to gain [his] waiver of rights and agreement to the interview." CP at 186. He also challenges the finding that he realized his criminal liability for his part in McComb's death.[5]
In his interview, Hughes indicated that he made the statements because he wanted his children back, wanted to "get on with [his] life," and did not want to break the law. CP at 167. And whether his statements helped him achieve that end, he wanted "things right in [his] life." CP at 167. He then volunteered to show the officers the possible locations of the body and the bat. Hughes also indicated that he had some understanding of the legal implications of his involvement in the case and should be awarded immunity for his statement.[6]
Harper clearly asked if Hughes was promised immunity, to which Hughes replied, "You said you will do everything you can." CP at 167. When asked the second time whether Harper promised Hughes anything, Hughes said, "No." CP at 168. Next, Harper asked if he coerced Hughes. The transcript indicates that Hughes's reply is indecipherable. Harper testified that Hughes's response was audible and he said, "No, I know I'm just probably going to get screwed, too." RP at 173. Finally, Hughes indicated that he voluntarily talked to the detectives.
The two July 13, 2000 interviews and the detective's testimony, believed credible by the trial court, substantially support the challenged findings, which in turn support the conclusion that Hughes voluntarily made the statements. Hughes offered information about a possible homicide hoping to make a deal, but by his own admission, no one offered him one.[7] Hughes's argument fails.

Uncharged Misconduct
Hughes next contends that the trial court denied him a fair trial by admitting evidence of uncharged burglary and weapons possession allegations. He argues that the court neglected to perform the required balancing before admitting evidence that Hughes stood by, armed, while Ambrose confronted Myers and Rocky Warner.
*686 The decision to admit evidence of other crimes or misconduct lies within the sound discretion of the trial court and we will not disturb it absent abuse of discretion. State v. Brown, 132 Wash.2d 529, 571-72, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. Brown, 132 Wash.2d at 572, 940 P.2d 546.
To admit evidence of other crimes or misconduct under ER 404(b), the trial court must identify on the record why it is admitted. Even if otherwise admissible for a valid purpose, ER 404(b) evidence still must be relevant to a material issue and its probative value must outweigh its prejudicial effect. Relevant evidence makes the existence of a consequential fact more or less probable. Brown, 132 Wash.2d at 571, 940 P.2d 546.
Under ER 404(b) evidence of other misconduct is not admissible to show that a defendant is a "criminal type." Brown, 132 Wash.2d at 570, 940 P.2d 546; State v. Lough, 125 Wash.2d 847, 853, 889 P.2d 487 (1995). But crimes or misconduct different from the acts for which a defendant is charged may be admitted for other reasons. ER 404(b). In addition to the non-exhaustive list of exceptions identified in ER 404(b) itself, our Supreme Court has recognized a res gestae or "same transaction" exception to the rule. Brown, 132 Wash.2d at 570-71, 940 P.2d 546; State v. Lane, 125 Wash.2d 825, 831, 889 P.2d 929 (1995).
Under the res gestae exception, evidence of other crimes or misconduct is admissible to complete the crime story by establishing the immediate time and place of its occurrence. Brown, 132 Wash.2d at 571, 940 P.2d 546. Where another offense constitutes a "link in the chain" of an unbroken sequence of events surrounding the charged offense, evidence of that offense is admissible "`in order that a complete picture be depicted for the jury.'" Brown, 132 Wash.2d at 571, 940 P.2d 546 (quoting State v. Tharp, 96 Wash.2d 591, 594, 637 P.2d 961 (1981)).
Here, the court allowed testimony about Hughes's armed involvement during Ambrose's confrontations with Warner and Myers under the res gestae exception. Although the court did not fully articulate the prejudicial value against its probative value on the record, the record provides adequate reasoning.[8]State v. Barragan, 102 Wash.App. 754, 759, 9 P.3d 942 (2000); State v. Carleton, 82 Wash.App. 680, 685, 919 P.2d 128 (1996) (if record reflects that the trial court adopted the express argument of one of the parties as to the relative weight of probative value and prejudice, there is no error). Hughes's argument fails.

Vouching Testimony
Hughes next contends that admitting Harper's testimony that Berry was an honest man denied Hughes a fair trial and constituted prosecutorial misconduct. A prosecutor commits misconduct when his or her examination seeks to compel a witness to give an opinion on whether another witness is telling the truth. State v. Jerrels, 83 Wash.App. 503, 507, 925 P.2d 209 (1996). Such questioning unfairly invades the jury's province. Jerrels, 83 Wash.App. at 507, 925 P.2d 209.
But where, as here, defense counsel raises no objection, we reverse only if the evidence was material to the trial's outcome and a curative instruction could not have remedied its prejudice. State v. Suarez-Bravo, 72 Wash.App. 359, 367, 864 P.2d 426 (1994). The misconduct must have been "so flagrant and ill-intentioned that a curative instruction could not have obviated the resulting prejudice." Suarez-Bravo, 72 Wash.App. at 367, 864 P.2d 426. And to determine whether the misconduct warrants reversal, we consider its prejudicial nature and its cumulative effect. Suarez-Bravo, 72 Wash.App. at 367, 864 P.2d 426.
*687 Before the response at issue, Harper testified that Berry was being uncooperative during the initial investigation. The detective also testified that Berry's cooperation level changed through the investigation's course. The prosecutor asked whether Harper knew what caused Berry's change in attitude. Harper gave a non-responsive answer that he believed Berry to be an honest person. Hughes's counsel did not object.
The prosecutor asked an open-ended question to which Harper gave an improper, albeit unsolicited response. It is unfortunate that the detective chose to comment on Berry's truthfulness, but defense counsel could have remedied the situation by objecting and moving to strike. Hughes's argument fails.

Restricting Argument
Hughes further contends that he was unable to present a complete defense because the trial court instructed both attorneys not to comment about any immunity discussions with Hughes.
We review trial court rulings restricting the scope of argument for abuse of discretion standard. State v. Perez-Cervantes, 141 Wash.2d 468, 475, 6 P.3d 1160 (2000). Counsel must be afforded "`the utmost freedom in the argument of the case'" and "`some latitude in the discussion of their causes before the jury.'" Perez-Cervantes, 141 Wash.2d at 474, 6 P.3d 1160 (citing Sears v. Seattle Consol. St. Ry. Co., 6 Wash. 227, 232, 233, 33 P. 389, 33 P. 1081 (1893)). But counsel's argument must be restricted to the facts in evidence and the applicable law to avoid misleading or confusing the jury.
Here, the court ruled that because no one granted Hughes immunity, no one could argue the issue. The prosecutor, not Hughes, sought to admit the immunity discussion in order to refer to it in closing arguments.
The court determined that because Hughes had no immunity, it was not part of the evidence and admitting it would lead to confusion. The trial court did not abuse its discretion in restricting arguments that would confuse the jury. See Perez-Cervantes, 141 Wash.2d at 474, 6 P.3d 1160.

Prosecutorial Misconduct
Hughes further contends that the prosecutor committed misconduct during closing argument when he invited the jury to speculate that Hughes was a principal in McComb's death, a fact not in evidence, and when he suggested that the jury should base its verdict on Hughes's failure to come forward earlier with incriminating statements and evidence.
Hughes bears the burden of showing that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Stenson, 132 Wash.2d 668, 718, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998). In closing argument, counsel has wide latitude in drawing and expressing reasonable inferences from the evidence. State v. Harvey, 34 Wash.App. 737, 739, 664 P.2d 1281, review denied, 100 Wash.2d 1008 (1983).
Here, the prosecutor first suggested that Hughes helped Ambrose by stopping McComb from running away. Then he noted inconsistencies between Harper's taped interview and pre-taped interview. As part of this evidence, the prosecutor suggested that perhaps Hughes minimized his involvement in the incident. The prosecutor's comments were reasonable inferences from the evidence. See Harvey, 34 Wash.App. at 740, 664 P.2d 1281.
Hughes also asserts that the prosecutor's comment on Hughes's failure to come forward with evidence about the murder earlier prejudiced him because it was a comment on his right to remain silent. We disagree.
In closing argument, the prosecutor suggested that Hughes was partly motivated to give information about the murder because of his Oregon arrest. It is undisputed that Hughes was arrested in Oregon approximately 14 months after the murder and then talked about McComb. The prosecuting attorney properly drew reasonable inferences from these facts and did not commit misconduct.

*688 Jury Instructions[9]
Hughes next contends that the trial court incorrectly instructed the jury because there was no evidence to suggest that McComb was killed in an attempted assault. And he argues because the State did not present evidence to support an attempted assault alternative, the trial court improperly instructed the jury.
A person attempts to commit a crime if he or she takes substantial steps in commission of the crime, with the intent to commit the principal crime. State v. Bencivenga, 137 Wash.2d 703, 707, 974 P.2d 832 (1999). And a charge of an attempt to commit a crime is included in a charge of the crime itself. State v. Rowe, 60 Wash.2d 797, 798, 376 P.2d 446 (1962).
Sufficient evidence supports a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. DeVries, 149 Wash.2d 842, 849, 72 P.3d 748 (2003) (citing State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992)).
Here, the jury instructions were proper and did not prejudice Hughes. The crime of second degree assault includes the crime of attempted second degree assault. The State needed to prove beyond a reasonable doubt that Hughes either committed second degree assault or attempted second degree assault.
The jury need not have found attempted assault if it believed that an assault occurred because assault includes the attempt charge. Hughes's statements, along with statements of other witnesses, constituted sufficient evidence of both assault and attempted assault. The acts were continual such that election of one specific act or unanimity was not required. State v. Crane, 116 Wash.2d 315, 325-26, 804 P.2d 10 ("Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means."), cert. denied, 501 U.S. 1237, 111 S.Ct. 2867, 115 L.Ed.2d 1033 (1991).

Ineffective Assistance of Counsel
Hughes further contends that he received ineffective assistance of counsel. He generally asserts that counsel failed to object to multiple instances of witness vouching and irrelevant evidence, failed to propose adequate jury instructions, and remained silent during improper closing arguments.
To succeed on his claim of ineffective assistance of counsel, Hughes must establish that deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have differed. State v. Lord, 117 Wash.2d 829, 883-84, 822 P.2d 177 (1991), cert. denied, 506 U.S. 856, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992). If this part of the test is not satisfied, the inquiry need go no further. State v. Hendrickson, 129 Wash.2d 61, 78, 917 P.2d 563 (1996).
A counsel's performance is not deficient if it concerns trial strategy or tactics. Hendrickson, 129 Wash.2d at 77-78, 917 P.2d 563. We engage in a strong presumption that counsel rendered adequate assistance and made all significant decisions exercising reasonable professional judgment. State v. Glenn, 86 Wash.App. 40, 45, 935 P.2d 679 (1997), review denied, 134 Wash.2d 1003, 953 P.2d 96 (1998).
Hughes's contentions of ineffective assistance stem from issues already addressed. He has failed to argue, except generally, how his counsel's conduct, even if deficient, prejudiced his case. Hughes's argument fails.[10]

Reversal Based on Andress

Hughes contends that our Supreme Court's recent decision in In re the Personal Restraint of Andress, 147 Wash.2d 602, 56 P.3d 981 (2002), amended and reconsideration *689 denied (2003), compels the reversal of his second degree felony murder conviction. He asserts that because the Andress court held that assault is not a predicate felony for purposes of RCW 9A.32.050(1)(b), the second degree felony murder statute, and because the decision applies retroactively,[11] his conviction must be reversed. We agree that Andress applies here and mandates us to reverse Hughes's second degree felony murder conviction.[12]

Conviction of Second Degree Assault or Attempted Second Degree Assault
Having determined that Hughes cannot be convicted of second degree felony murder based on a predicate of second degree assault, we next must decide whether Hughes can be convicted of another offense. Unlike in Andress, Hughes was not convicted of a separate assault charge below. Accordingly, we must determine whether second degree assault is a lesser included offense of second degree felony murder. Gamble, 118 Wash.App. 332, 72 P.3d 1139 (2003).
In Gamble, we stated the proper inquiry in such a case is "whether the jury necessarily found each element of the lesser included offense beyond a reasonable doubt in reaching its verdict on the crime charged." 118 Wash.App. ___, 72 P.3d at 1141. If proof of the elements of the second degree felony murder conviction establishes guilt of another lesser included offense, that person may properly be resentenced on that lesser included offense. Gamble, 118 Wash.App. ___, 72 P.3d at 1141.
The Gamble court applied the "as charged" analysis stated in State v. Berlin, 133 Wash.2d 541, 548, 947 P.2d 700 (1997),[13] and concluded that the charges and the evidence revealed that first degree manslaughter was a lesser included offense of second degree felony murder, as charged in violation of second degree assault.[14] 118 Wn.App. ___, 72 P.3d at 1142. We also apply an "as charged" analysis, but because our facts differ from those in Gamble, we reach a different conclusion.
Here, the "to convict" jury instruction stated:
To convict the defendant of the crime of Murder in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about the 24th through the 25th day of April, 1999, Ronald G. McComb was killed;
(2) That the defendant or an accomplice was committing or attempting to commit the crime of Assault in the Second Degree;
(3) That the defendant or an accomplice caused the death of Ronald G. McComb, in the course of and in furtherance of such crime;
(4) That Ronald G. McComb was not a participant in the crime; and
*690 (5) That the acts occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.
CP at 96 (instruction 15).
And instruction 16 defined second degree assault as, "A person commits the crime of Assault in the Second Degree when he or an accomplice assaults another with a deadly weapon." CP at 97. Finally, instruction 19 defined assault as:
An assault is the touching and striking of another person that is harmful or offensive. A touching or striking is offensive, if the touching or striking would offend an ordinary person who is not unduly sensitive.
An assault is also an act, done with intent to inflict bodily injury upon another, tending, but failing to accomplish it, and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
An assault is also an act, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.
CP at 100.
In Gamble, the second degree assault definition included the element of recklessly inflicting substantial bodily harm. 118 Wash.App. ___, 72 P.3d at 1142. This definition was consistent with the elements required for first degree manslaughter; that is, recklessly causing the death of another. RCW 9A.32.060(1)(a). Hence, the Gamble court held that Gamble could be found guilty of first degree manslaughter.
But here the recklessly causing the death of another element was not presented to the jury. Instead, the court instructed the jury on the elements of a lesser included offense that are consistent only with the crime of second degree assault.[15] And the charges and evidence show that the jury necessarily found all the elements of second degree assault.[16]
Accordingly, we reverse Hughes's second degree felony murder conviction and remand to the trial court with directions to enter a verdict of guilty on the lesser included offense of second degree assault and sentence Hughes accordingly.
We concur: BRIDGEWATER, J., and LADLEY, J. Pro Tem.
NOTES
[1] Because we vacate the second degree felony murder conviction on different grounds, we do not address Hughes's argument that insufficient evidence supported finding that he knew he was facilitating second degree murder.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (before a custodial interrogation takes place, the police must warn the person of the right to remain silent, that any statement may be used as evidence against the person and that the person has a right to have an attorney).
[3] CrR 3.5(a) provides: "When a statement of the accused is to be offered in evidence, the judge at the time of the omnibus hearing shall hold or set the time for a hearing, if not previously held, for the purpose of determining whether the statement is admissible."
[4] Setzer and Braun held that confessions that were "extracted by any sort of threats or violence," or "obtained by any direct or implied promises, however slight, or by the exertion of any improper influence" were not voluntary. Broadaway, 133 Wash.2d at 132, 942 P.2d 363.
[5] It is unchallenged that the detectives advised Hughes of his Miranda rights.
[6] Hughes said, "Like I said I'm the only person that was there alone with Dave. And I know I'm probably an accessory, or whatever. And I do believe that I should gain some kind of immunity out of this." CP at 167.
[7] In its cross-appeal, the State contends that all of Hughes's statements were voluntary. We do not address the State's cross-appeal because, as the State agreed at argument, our affirmance renders this issue moot.
[8] The State argued that the evidence showed that the charged crime was part of the same transaction and admissible under the res gestae exception. Hughes argued that the evidence was irrelevant and prejudicial. The record reflects that the trial court adopted the State's argument and considered the prejudicial and probative assessment Hughes raised. The trial court did not err in failing to completely articulate its reasoning.
[9] Because we reverse and vacate Hughes's felony murder conviction, we limit our analysis to his second degree assault and attempted second degree assault instructional error claims.
[10] Hughes raises other issues, but he does not sufficiently brief or argue them to support review. RAP 10.3(a).
[11] We recently discussed this issue in State v. Gamble, 118 Wash.App. 332, 72 P.3d 1139 (2003). In that case, we held that Andress applies to all cases on direct review because it is a new rule announced by our Supreme Court and "applies to all cases pending direct review at the time the rule is announced." Gamble, 118 Wash.App. at ___, 72 P.3d at 1140.
[12] The State asks us to overrule the Washington Supreme Court's ruling in Andress because it is "incorrect and harmful," and the Legislature later reaffirmed its intent that assault serves as a predicate offense to felony murder. Laws of 2003, ch. 3, § 1. As the State recognizes, our intermediate appellate court cannot overrule the Supreme Court. We are bound to follow its rulings. And although the Legislature amended RCW 9A.32.050, the second degree murder statute, its amendment does not affect Andress. State v. Dean, 113 Wash.App. 691, 699, 54 P.3d 243 (2002) (when our Supreme Court first interprets a statute, that interpretation operates as if it were originally written into the statute), review denied, 149 Wash.2d 1009, 67 P.3d 1097 (2003).
[13] Berlin sets forth a test to determine whether a lesser included offense is proven by the greater offense: "To establish that an offense is a lesser included offense, the rule is: first, each of the elements of the lesser offense must be a necessary element of the offense charged; second, the evidence in the case must support an inference that the lesser crime was committed." 133 Wash.2d at 548, 947 P.2d 700.
[14] In Gamble, the court instructed the jury on second degree assault: "A person commits the crime of Assault in the Second Degree when he intentionally assaults another and thereby recklessly inflicts substantial bodily harm." 118 Wash.2d ___, 72 P.3d at 1142.
[15] RCW 9A.36.021(1) defines second degree assault:

A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:
(a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm; or
(b) Intentionally and unlawfully causes substantial bodily harm to an unborn quick child by intentionally and unlawfully inflicting any injury upon the mother of such child; or
(c) Assaults another with a deadly weapon; or
(d) With intent to inflict bodily harm, administers to or causes to be taken by another, poison or any other destructive or noxious substance; or
(e) With intent to commit a felony, assaults another; or
(f) Knowingly inflicts bodily harm which by design causes such pain or agony as to be the equivalent of that produced by torture.
[16] Because we vacate Hughes's second degree felony murder conviction, we do not address other issues he raises in his supplemental brief.