IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

FILED
COURT OF APPEALS
DIVISION II

2014 DEC -2 AM 8: 57

STATE OF WASHINGTON
BY_____
DEPUTY

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44385-6-II |
| Respondent, | |
| | UNPUBLISHED OPINION |
| v. | |
| DANIEL GARBER, | |
| Appellant. | |

BJORGEN, A.C.J. — Following a bench trial, the trial court found Daniel Garber guilty of two counts of theft of a motor vehicle.[1] Garber appeals, asserting that the trial court erred by failing to suppress statements he had made while in police custody and by ordering him to forfeit property that police officers had seized. Garber also argues that, absent his custodial statements, there was insufficient evidence to support his convictions. We affirm.

FACTS

On April 23, 2012, Matthew Cowan reported to police that his 1984 Oldsmobile Regency had been stolen from a Lakewood Target store parking lot. A Target loss prevention officer provided police with surveillance video footage that showed Cowan's car being stolen. Two days later, on April 25, Jamal Robinson reported to police that his 1975 Chevrolet Caprice had been stolen from a carport of the Tacoma apartment complex where he lived. Robinson provided police with surveillance video footage that showed the theft of his vehicle. Both the apartment's and Target's video footage showed that a red Ford Fusion with black rims was present during the thefts.

---

[1] The trial court found Garber not guilty of possession of a stolen vehicle.

On April 26, Garber's father called the police regarding a Chevrolet Caprice that was parked near where he lived. Garber's father knew that the car did not belong to his son because his son drove a red Ford Fusion. At some point, Garber had told his father that he was planning to help fix the Chevrolet Caprice with his friend, Damien Hudson, who he referred to as "D Shot." Report of Proceedings (RP) (Nov. 6, 2012) at 23-24.

Lakewood Police Officer Jeff Hall and Pierce County Sheriff's Detective Shaun Darby, were driving to Garber's father's residence when they saw a red Ford Fusion followed closely by a green Nissan Quest. The officers ran license plate checks on the vehicles and found that the Ford Fusion was registered to Garber and that the Quest van was reported stolen. After stopping the vehicles, the officers arrested Garber and the driver of the Quest van.

The State charged Garber by amended information with two counts of theft of a motor vehicle and one count of possession of a stolen vehicle. The State also alleged that Garber committed his offenses shortly after being released from incarceration and that his high offender score would result in some of his current offenses going unpunished.

Before trial, the defense moved to suppress statements Garber had made during a police interrogation, and the trial court considered that motion as part of its hearing under CrR 3.5. At that hearing, Officer Hall testified that he had transported Garber to the Lakewood Police Department and placed him in a holding cell before moving Garber to an interview room and removing his restraints. Officer Hall stated that he had advised Garber of his constitutional rights in writing and that Garber had agreed to waive those rights and to be interviewed by the police. Officer Hall said that Garber did not appear to be intoxicated during the interview.

Video footage of the police interview was played at the CrR 3.5 hearing, in which Garber admitted to his involvement with the Oldsmobile and Caprice thefts. Garber also admitted in the

footage that Hudson was also involved in the Oldsmobile and Caprice thefts. When asked on cross examination at the hearing whether Garber appeared to be "nodding off" during the interview, Officer Hall stated, "I observed that to be more of a sign of psychological defeat in the interview process." RP (Nov. 5, 2012) at 48. Officer Hall explained Garber's "psychological defeat" to mean,

> physical signs he was giving up during the interview. In other words, put his head on the desk, put his hands around his face, covering his mouth during several instances. And those are all sometimes verbal or visual indicators of someone who is giving up in an interview process if he's being interrogated.

RP (Nov. 5, 2012) at 49.

At the time of Garber's interrogation, Officer Hall had recently seen a bulletin about a shooting at the University of Puget Sound (UPS) involving an attempted car theft. Officer Hall testified that, after Garber discussed dropping off Hudson near UPS around the same time as the shooting, he "prob[ed]" Garber about the shooting to determine whether Garber had been involved in the incident. RP (Nov. 5, 2012) at 50. Officer Hall further testified that he did not make any threats or promises to Garber to elicit Garber's waiver of rights or to induce Garber's answers during the interrogation.

Detective Darby testified at the CrR 3.5 hearing consistently with Officer Hall. The following exchange took place during Detective Darby's cross-examination:

> [Defense counsel]:And at one point on the tape you say to Mr. Garber, Here's the deal, if D Shot is going to take you down, I can deal with that. What did you mean by that?
> [Darby]: That means if D Shot is going to, I guess, implement [sic] him in the crimes that D Shot has committed.
> [Defense counsel]: What crime was that?
> [Darby]: At that point alls [sic] I had known is what Mr. Garber was telling me that he was involved in the auto thefts.
> [Defense counsel]: You had some information on a shooting at UPS, is that correct?
> [Darby]: Correct.

3

[Defense counsel]: What information, specifically, did you have with regard to that shooting?

[Darby]: That during the evening of April 25th, an individual was interrupted by University of Puget Sound Security Officers as either prowling or attempting to steal a vehicle. Those security officers contacted this individual, some sort of altercation occurred, and this individual ended up shooting at the security officers and then fleeing in a stolen vehicle.

[Defense counsel]: So it is unclear to me when you are talking about Mr. Garber going down with D Shot, if you're talking about the stolen cars or the shooting case.

[Darby]: I don't know if D Shot had anything to do with the shooting case.

[Defense counsel]: You say to Mr. Garber, You're going to be with D Shot on that whole thing or you're going to come clean. From when I listened to the tape, it sounds like you're referring to the UPS shooting, not the vehicle thefts, would you agree with that?

[Darby]: Yes.

[Defense counsel]: So did you have any information that Mr. Garber was a suspect in the UPS shooting?

[Darby]: I had no information as to who the suspects were, but moments earlier Mr. Garber had confessed to me how he had been in the area of University of Puget Sound during the time the shooting occurred, and that he had dropped D Shot off at the University of Puget Sound in the area where the shooting occurred. So I began to suspect those two might actually be involved because the suspect was still outstanding from that shooting.

[Defense counsel]: What does it mean that Mr. Garber is going to be with D Shot on this whole thing, what does that mean?

[Darby]: That if D Shot is responsible for the shooting at UPS, that Mr. Garber could also be involved in it as well through his confession as he confessed to dropping D Shot off there.

[Defense counsel]: And at that point, you say to Mr. Garber that, you are going to come clean, is that correct?

[Darby]: I think I asked him if he was going to come clean.

RP (Nov. 5, 2012) at 65-67.

Garber testified at the CrR 3.5 hearing that he had been awake for eight days at the time of his arrest due to his methamphetamine use. Detective Darby testified that he did not find any methamphetamine on Garber. Garber further testified that he had slept in his holding cell before police took him to an interview room. Garber stated that he had agreed to waive his rights and to speak with police because he "was so tired [and] . . . just wanted to get it over with." RP (Nov. 6, 2012) at 13. Garber said that he admitted his involvement in the car thefts because he was

4

concerned that he would be charged with assault for the UPS shooting. The following exchange then took place:

> [Prosecutor]: Did they make any promises?
> [Garber]: No.
> [Prosecutor]: Did they threaten with anything?
> [Garber]: No.
> [Prosecutor]: Did the officers ever say, if you cooperate with us, we won't charge you with this shooting at UPS?
> [Garber]: They were trying to implicate [sic 'imply?'] that.
> [Prosecutor]: In what way?
> [Garber]. If I came clean and told them what they wanted to hear about the two cars, that they wouldn't charge me with it. But if I didn't, they would charge me no matter what.

RP (Nov. 6, 2012) at 13-14.

Following the CrR 3.5 hearing, the trial court ruled that Garber's custodial statements were admissible and later entered findings of fact and conclusions of law. Garber waived his jury trial right and the case proceeded to a bench trial. The trial court found Garber guilty of two counts of motor vehicle theft and not guilty of unlawful possession of a stolen vehicle. The trial court also ordered Garber to "forfeit any property seized by law enforcement in this matter." Clerk's Papers (CP) at 47. Garber timely appeals.

ANALYSIS

I. CrR 3.5 RULING

Garber first contends that the trial court erred by failing to suppress statements he made during the police interrogation, assigning error to the trial court's finding that "[n]o threats or promises were made to the defendant" and to its conclusion that "Garber's confession was voluntary and not the result of coercion; based upon the totality of the circumstances Garber's will was not overborne." CP at 57-58; Br. of Appellant at 1. We affirm the trial court's CrR 3.5 ruling denying Garber's motion to suppress.

The Fifth Amendment to the United States Constitution requires police officers to inform a suspect of his *Miranda*[2] rights before questioning the suspect in a custodial setting. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). We review de novo the validity of a suspect's waiver of *Miranda* rights and will uphold the trial court's voluntariness determination "if there is substantial evidence in the record from which the trial court could have found the confession was voluntary by a preponderance of the evidence." *State v. Aten*, 130 Wn.2d 640, 664, 927 P.2d 210 (1996); *see also State v. Broadaway*, 133 Wn.2d 118, 130, 942 P.2d 363 (1997).

> Under *Miranda v. Arizona*, a confession is voluntary, and therefore admissible, if made after the defendant has been advised concerning rights and the defendant then knowingly, voluntarily and intelligently waives those rights. To be voluntary for due process purposes, the voluntariness of a confession is determined from a totality of the circumstances under which it was made.

*Aten*, 130 Wn.2d at 663-64 (internal footnotes omitted). When examining the totality of the circumstances surrounding a defendant's confession, courts consider the location, length, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; and whether the police had advised the defendant of his Fifth Amendment rights. *State v. Unga*, 165 Wn.2d 95, 101, 196 P.3d 645 (2008). Additionally, "[t]he totality-of-the-circumstances test specifically applies to determine whether a confession was coerced by any express or implied promise or by the exertion of any improper influence." *Unga*, 165 Wn.2d at 101 (citing *Broadaway*, 133 Wn.2d at 132).

A defendant's custodial statements are not admissible at trial if police tactics manipulated or prevented the defendant from making a rational, independent decision about giving a

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

No. 44385-6-II

statement. *Unga*, 165 Wn.2d at 102. However, a promise made by police during a custodial interrogation, alone, does not render a defendant's resulting confession involuntary; instead, the relevant inquiry is "whether the defendant's will was overborne by the promise." *Unga*, 165 Wn.2d at 102 (citing *Broadaway*, 133 Wn.2d at 132). As our Supreme Court has explained:

> A police officer's psychological ploys such as playing on the suspect's sympathies, saying that honesty is the best policy for a person hoping for leniency, or telling the suspect that he could help himself by cooperating may play a part in a suspect's decision to confess, "but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary."

*Unga*, 165 Wn.2d at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)).

Garber does not argue that the interrogating officers failed to advise him of his *Miranda* rights before he confessed to his involvements in the car thefts. Instead, he argues that Detective Darby's use of the UPS shooting as a means to induce a confession, coupled with his diminished mental state from having smoked methamphetamine, rendered his confession involuntary. We disagree.

There was conflicting evidence presented at the suppression hearing regarding Garber's mental state at the time of the interrogation, which conflicting evidence we do not resolve in our position as an appellate court. *State v. Hughes*, 118 Wn. App. 713, 722, 77 P.3d 681 (2003). Although Garber testified at the CrR 3.5 hearing that he had been awake for eight days prior to his arrest due to his methamphetamine use, he also testified that he had slept in his holding cell before the interrogation began. Officer Hall testified that Garber did not appear to be intoxicated during the interrogation, and Detective Darby testified that he did not find any methamphetamines on Garber when he was arrested. Additionally, the State presented as evidence at the suppression hearing video footage of the police interrogation in which the trial court could evaluate whether Garber's demeanor and responses to police questioning showed

7

that his decision-making process was impaired due to his mental state. Accordingly, there was substantial evidence before the trial court that Garber's claimed methamphetamine use and resulting lack of sleep did not affect the voluntariness of his confession. Under the totality of circumstances test described in *Unga*, 165 Wn.2d at 101, the court did not err for these reasons in concluding that Garber's confession was voluntary.

On the remaining question, whether Detective Darby's interrogation tactics rendered Garber's confession involuntary, the *Unga* decision is instructive. In that case, the juvenile defendant, Unga, confessed to writing graffiti on the interior of a stolen car after a police detective explicitly promised the defendant that he would not be charged with the graffiti to the dashboard. 165 Wn.2d at 99. He was later charged and found guilty of vehicle prowling and taking a motor vehicle without permission. *Unga*, 165 Wn.2d at 97. Unga appealed, arguing that his confession should not have been admitted as evidence because it had been coerced by the detective's promise. *Unga*, 165 Wn.2d at 97. Our Supreme Court disagreed and affirmed Unga's juvenile verdicts of guilt, reasoning that, even if Unga reasonably believed that the detective's promise not to prosecute for the graffiti was a grant of immunity regarding all the crimes related to the vehicle, "'[t]he mere fact that an unfulfilled promise was made in exchange for a person's statement does not constitute coercion, rendering the statement involuntary.'" *Unga*, 165 Wn.2d at 105 (quoting *United States v. Flemmi*, 225 F.3d 78, 91 (1st Cir. 2000)). The *Unga* court stated, "Such a promise, like any other promise of leniency, is only one factor in the totality of the circumstances analysis and it must be considered in the context of all of the circumstances . . . the key is whether the promise made it impossible for the defendant to make a rational choice as to whether to confess." 165 Wn.2d at 105, 108.

8

On one hand, *Unga* differs from the circumstances of this appeal in that Garber is not claiming that the State prosecuted him for offenses which it promised it would not prosecute, in exchange for his confession. On the other hand, a number of the circumstances that led the *Unga* court to deem the confession voluntary are also present here. Garber is an adult who had been released from incarceration shortly before his arrest and, as such, was familiar with the criminal justice system. Thus, like Unga, Garber was clearly aware that he was being questioned as a criminal suspect. Also like Unga, Garber was informed of his constitutional rights, including his right to remain silent, to have an attorney present before and during questioning, and to stop answering questions at any time during the interrogation. Garber acknowledged his understanding of those rights but chose not to exercise them at any point in the interrogation leading up to his confession. Additionally, as in *Unga*, there was no evidence that the interrogating officers used any intimidation tactics or that they deprived Garber of any necessities.

Most importantly, unlike in *Unga*, Garber conceded at the suppression hearing that Detective Darby did not make any express threats or promises in exchange for his interrogation answers. Although Detective Darby's statement, "You're going to be with [Hudson] on that whole thing or you're going to come clean," is threatening, Garber's concession supplies substantial evidence to support the trial court's finding that "[n]o threats or promises were made to the defendant." RP (Nov. 5, 2012) at 66; CP at 57. Were we to deem this finding not supported by the evidence, we would step troublingly close to reweighing evidence or making credibility determinations, tasks in the hands of the trial court, not us. *State v. McCreven*, 170 Wn. App. 444, 476-77, 284 P.3d 793 (2012), *review denied*, 176 Wn.2d 1015, 297 P.3d 708 (2013). For these reasons, we uphold the court's finding that no threats or promises were made.

9

With that finding, the trial court's conclusions that Garber's confession was voluntary, not the result of coercion, and that his will was not overborne, are well supported by the findings and consistent with governing legal principles discussed above. Accordingly, we hold that Garber's confession was voluntary, and we affirm the trial court's CrR 3.5 ruling denying Garber's motion to suppress.[3]

## II. FORFEITURE ORDER

Next, Garber contends that the trial court acted without statutory authority when it ordered him to forfeit property that had been seized by police following his arrest.[4] We must reject this contention, because the record is not sufficient for its review.

In *State v. McWilliams*, we rejected the challenge to a sentencing court's order to "'[f]orfeit all property seized.'" 177 Wn. App. 139, 151, 311 P.3d 584 (2013), *review denied*, 179 Wn.2d 1020, 318 P.3d 279 (2014). As part of the analysis, we noted that CrR 2.3(e) governed motions for the return of illegally seized property and that the defendant could make such a motion "'at any time, including after a determination of guilt.'" *McWilliams*, 177 Wn. App. at 151 (quoting *State v. Card*, 48 Wn. App. 781, 786, 741 P.2d 65 (1987)). We further noted that "[a]lthough the State has the initial burden [to show a possessory right to seized property, CrR 2.3(e)] contemplates that the defendant moves for the property's return and that an

---

[3] Because Garber's sufficiency of the evidence argument relies on the suppression of his confession, we need not reach it.

[4] As an initial matter, we reject the State's argument that this issue is not properly before us due to Garber's failure to object to the sentencing provision at issue below. It is well established that "[a]n appellant may challenge an illegal or erroneous sentence for the first time on appeal." *State v. McWilliams*, 177 Wn. App. 139, 150, 311 P.3d 584 (2013) (citing *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999)), *review denied*, 179 Wn.2d 1020, 318 P.3d 279 (2014); *see also State v. Bahl*, 164 Wn.2d 739, 744-45, 193 P.3d 678 (2008).

evidentiary hearing ensues." *McWilliams*, 177 Wn. App. at 151 (citing *State v. Marks*, 114 Wn.2d 724, 735-36, 790 P.2d 138 (1990)).

Garber has failed to move for the return of seized property under CrR 2.3(e), and we are therefore without the results of the evidentiary hearing that the rule would afford. Additionally, although Garber specifically identifies in his appeal a possessory interest in the Ford Fusion, it is unclear on this record whether the Ford Fusion remains within the possession of the State. For these reasons, the record before us is insufficient to review Garber's challenge to the forfeiture order. *See, e.g., Wash. Pub. Trust Advocates v. City of Spokane*, 120 Wn. App. 892, 898, 86 P.3d 835 (2004) ("If the record is insufficient for review, we may decline review of a particular issue.")

Accordingly, we affirm Garber's convictions and resulting sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, J.

We concur:

JOHANSON, C.J.

MELNICK, J.

11