IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| LAKODA, INC., a Washington corporation, | ) ) ) ) | No. 32616-1-III |
| Respondent, | ) ) | |
| v. | ) ) ) | UNPUBLISHED OPINION |
| OMH PROSCREEN USA, INC., a Washington corporation; BRAD HILMOE, a married individual; JOHN O'CONNELL, a married individual; OMH INNOVATIONS, INC., a foreign corporation, | ) ) ) ) ) ) ) ) ) | |
| Appellants. | ) ) | |
| OMH PROSCREEN USA, INC., a Washington corporation, | ) ) ) | |
| Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| DALE AMES and DODIE AMES, husband and wife, and the marital community comprised thereof, | ) ) ) ) | |
| Third-Party Defendants. | ) | |

SIDDOWAY, J. — OMH Proscreen USA, Inc. and its codefendants in the trial

below appeal the results of a 9-day jury trial at the conclusion of which the jury awarded

a total of $250,002 in damages to Lakoda, Inc., for breach of contract, tortious

interference with a business expectancy, and misappropriation of trade secrets. The trial court awarded an additional $231,441 in attorney fees. The defendants challenge the trial court's exclusion of evidence they contend was critical to their defense and counterclaims, the admissibility and sufficiency of Lakoda's evidence of damages, and the trial court's award of attorney fees.

We find no error or abuse of discretion and affirm.

## FACTS AND PROCEDURAL BACKGROUND

Lakoda is a self-described "contract manufacturer." 1 Report of Proceedings (RP) (May 6, 2014) at 66. It acts as an intermediary between businesses that need a product manufactured and factories that can deliver an acceptable product at an acceptable price. As middle man, Lakoda identifies a factory capable of producing the desired product, obtains a price, marks it up, and then offers the product to the manufacturing customer at the marked-up price. To protect itself from customers who might try to go around it and contract directly with the factory once the manufacturing operation has been established, Lakoda has a vendor nondisclosure agreement that it requires customers to sign before arranging manufacturing services.

Among areas of the world in which Lakoda has established expertise and manufacturing contacts is China. Its manufacturing contacts in China at times relevant to this dispute included the Longfei factory in Changzhou, and Geng Min, an engineer and the owner of a business called Tomorrow Product Development, or TPD. Virtually all

2

references to Geng Min during trial were as "Peter" or "Peter G.," his nickname, which we will use, intending no disrespect.

In March 2010, Dale Ames, Lakoda's owner, met Brad Hilmoe, an officer and owner of OMH or its affiliates[1] on a flight to San Francisco. Both men's ultimate destination was China. OMH was in the business of selling soil screening equipment and at the time was having some of its soil screeners manufactured at a factory in Yantai. The products were not being made to Mr. Hilmoe's satisfaction.

After Mr. Hilmoe returned to the states, he arranged for Mr. Ames to meet with him and his co-owner of OMH, John O'Connell, to explore whether to have Lakoda assist them in lining up manufacture of their soil screeners in a different Chinese factory. Before the meeting, Mr. Ames e-mailed Lakoda's standard nondisclosure agreement to Mr. Hilmoe. The agreement contains provisions protecting both Lakoda's and "the Vendor's" (in this case, OMH's) "Confidential Information" disclosed in connection with evaluating a potential "customer/supplier relationship." The agreement defines "Confidential Information" as

---

[1] At trial, the three affiliated OMH companies named as defendants presented a united defense. Midtrial, Lakoda stipulated to dismissal of its claims against the Canadian corporation, OMH Innovations, Inc. Judgment was entered against the two remaining corporations. Since the history and roles of the entities need not be distinguished (and from the record, probably could not be) we refer to them individually and collectively as "OMH."

3

> *all information of either Party that is not generally known to the public, whether of a technical, business or other nature* (including, without limitation, trade secrets, know how and information relating to the technology, customers, business plans, promotional and marketing activities, finances and other business affairs of such Party), *that (i) is disclosed by one Party (the "Disclosing Party") to the other Party* (the "Receiving Party"), and (ii) if in tangible form, is identified by the Disclosing Party . . . as confidential. . . . Confidential Information also includes all information concerning the existence and progress of the Parties' dealings.

Ex. 5, at 1 (emphasis added).

The agreement provided that a receiving party would not disclose a disclosing party's confidential information without consent, that it would take measures to protect confidential information, and that it "[would] not use, or permit others to use, Confidential Information for any purpose other than evaluation and performing its obligations under any customer/supplier relationship between the parties resulting therefrom." *Id.* Mr. Ames signed the agreement on behalf of Lakoda, Inc., and Mr. O'Connell signed on behalf of OMH. The parties then orally agreed that Lakoda would undertake to identify a new manufacturing source in China for OMH's products.

OMH provided Lakoda with target pricing for the screeners, some idea of the quantity to be produced, and OMH's screener designs. Armed with this information, Mr. Ames contacted Peter, who worked with the Longfei factory to arrive at a quote for producing the screeners.

4

Lakoda began to source parts necessary for the production of the screeners at Longfei and manufacturing began. For almost a year, OMH accepted Lakoda quotes, provided Lakoda with purchase orders, and Lakoda invoiced OMH at the marked-up price it had quoted.

In October 2010, OMH hired an employee in China to monitor quality control at Longfei. His name was Wang Fuliang, but most witnesses at the trial referred to him by his nickname, "Jack." Through Jack and through his own time spent in Changzhou, Mr. Hilmoe began to receive information about how Longfei was faring under the manufacturing relationship. He learned Longfei's management was disgruntled about slow payment and the price it was receiving for the screeners. The information Mr. Hilmoe received led to a dispute between OMH and Lakoda over whether Lakoda was taking a bigger markup than had been agreed, leaving Longfei with too little to make the manufacturing relationship worthwhile. Facing threats from Longfei that it would cease manufacturing the screeners, OMH "cut [Lakoda] out of the picture" in April 2011 and began purchasing screeners directly from Longfei. 1 RP (May 6, 2014) at 137-38.

Lakoda filed suit against OMH and Mr. Hilmoe shortly thereafter, alleging breach of contract; breach of the implied covenant of good faith and fair dealing; violation of Washington's Uniform Trade Secrets Act, chapter 19.108 RCW; and tortious interference with a business expectancy. Lakoda accused OMH of using its confidential information

5

(the identity of the Longfei factory and the screener manufacturing capability it had developed) in violation of the nondisclosure agreement.[2]

In answering the complaint, OMH counterclaimed, alleging Lakoda had failed to protect its proprietary designs in violation of the nondisclosure agreement and had violated an alleged oral agreement that Lakoda's markup of Longfei's price would be limited to 10 percent. According to OMH, Peter or Lakoda misled Longfei about the volume of screeners OMH would purchase, leading Longfei to quote a price at which it could not make money.

OMH also claimed Lakoda did not obtain a nondisclosure agreement from Longfei until February 2011, two months *after* Longfei registered OMH's designs in China, in Longfei's name. OMH contended Longfei alone could manufacture OMH's screeners in China and as a result, when Longfei refused to continue manufacturing unless it was paid more, OMH "was *forced* to renegotiate the terms of the manufacturing agreement" with Longfei. Clerk's Papers (CP) at 61 (emphasis added). According to Mr. Hilmoe, "OMH had no recourse against the [Longfei] factory." CP at 208. Finally, OMH alleged Longfei sold OMH's designs to two Canadians, Viorel Mazilescu and Gerald Clancy,

---

[2] After Lakoda learned in discovery of the OMH affiliates and that the business had not been incorporated when the nondisclosure agreement was signed, it amended its complaint to name the affiliates and Mr. O'Connell, individually, as defendants.

who began selling "knock-off" screeners in competition with OMH. CP at 191. It accused Mr. Ames of being complicit in that misappropriation of its designs.

In pretrial rulings, the court held that a document that appeared to be written in Chinese and that OMH represented was Longfei's "registration" in China of its drawings was inadmissible. It reserved ruling on whether testimony about the registration would be admitted.

When OMH sought to elicit testimony about the registration during trial, the court sustained an objection to its relevance. OMH renewed its effort to offer the evidence after Lakoda allegedly "opened the door" by inquiring into what measures OMH had taken to protect its designs in the United States and Canada. The court again held that testimony about the alleged Chinese registration was not relevant.

Also during trial, the court excluded a portion of testimony from Gerald Clancy's perpetuation deposition about a videoclip, as well as the videoclip itself, which OMH offered as evidence during the deposition. The court rejected OMH's argument that Mr. Clancy's limited testimony about the videoclip was relevant or sufficient.

A halftime motion by OMH on several claims was denied.

After a week and a half of trial, the jury returned a special verdict in favor of Lakoda on every claim and counterclaim. It awarded $1 in damages on the tortious interference claim, $1 in damages for misappropriation of trade secrets, and $250,000 for breach of contract. Lakoda contended, and the trial court agreed, that the three claims

7

overlapped and that the $1 verdicts merely reflected the jury's compliance with the court's instruction not to duplicate damages.

The court thereafter granted Lakoda's motion for an award of attorney fees on its trade secret claim, finding reasonable attorney fees of $231,441.

OMH appeals.

## ANALYSIS

OMH assigns error to (1) the trial court's exclusion of evidence that Longfei registered its designs in China, including after Lakoda allegedly "opened the door" to that evidence; (2) the court's exclusion of a videoclip and testimony offered as authentication; (3) the court's denial of its halftime motion that its nondisclosure agreement with Lakoda barred recovery of lost profits; (4) the trial court's denial of its halftime motion on Lakoda's trade secret claim; (5) the trial court's admission of Lakoda's damage summaries and the sufficiency of those summaries to support the jury's verdict; and (6) the trial court's award of attorney fees. We address the issues in the order stated.

### I. Exclusion of evidence of Chinese "registration"

#### *A. Initial exclusion*

Before trial, Lakoda filed a motion in limine asking the court to exclude all evidence and argument that Longfei had registered OMH's screener designs in China. Among its arguments were that Chinese law had not been pleaded as required by CR 9 and 44.1 and the legal effect of any registration (if its proposed exhibit *was* a registration)

8

was unknown by the parties or the court. It also argued that because a culpable mental state was not relevant to Lakoda's claims, Mr. Hilmoe's motivation for continuing to work with Longfei was irrelevant.

OMH responded that it intended to offer evidence of the registration and authentication through Xiao Ping Zahang, an owner or manager of the Longfei factory, who could read Chinese. Either Mr. Zahang or Mr. Hilmoe could testify to their understanding of the registration's significance. It argued that Mr. Hilmoe's motivation was relevant to its affirmative defense to Lakoda's tortious interference claim and the element of willfulness or maliciousness under the Uniform Trade Secrets Act, chapter 19.108 RCW.

The court ruled that the purported registration, defendants' proposed Exhibit 329, was irrelevant, would not be admitted, and that it would sustain an objection to testimony about the actual legal effect of registration. But it reserved ruling on whether to admit evidence bearing on Mr. Hilmoe's beliefs and how they affected his motivation in continuing to work with Longfei.

When OMH called Mr. Zahang at trial, he was allowed to answer the following questions about registration:

Q [A]t that time that you decided not to manufacture anymore, were you concerned about the money that you had invested in building the screeners?
A Yes.

9

Q  Did you take any measures to try to protect your investment that you had put into the manufacture of the screeners? Yes or no, please.
A  To protect the product, we applied to get a document.
[LAKODA'S LAWYER]: Judge, I'm going to object. This goes to the Motion in Limine.
THE COURT: I understand. If he can answer the question as a yes or no, can he answer the question as it's asked as a yes or no?
THE WITNESS: Yes.

2 RP (May 7, 2014) at 306-07. Shortly thereafter, Mr. Zahang referred to a time "[w]hen I told, you know, they are not working with Peter anymore [sic]." 2 RP (May 7, 2014) at 307. He was then asked, and answered:

Q  At any time subsequent—anytime after that, did you tell Brad or Jack that Longfei was the only one that was allowed to manufacture screeners in China?
A  Yes.

*Id.*

OMH then called Mr. Hilmoe as a witness, and the following testimony was given and objections were made:

Q  Do you recall hearing [Xiao Ping] state that he believed that only the Longfei factory could manufacture your product?
A  Yes.
Q  What was your understanding of that situation?
A  I no longer had any control over my designs at the time.

3 RP (May 8, 2014) at 540. When OMH's lawyer then asked Mr. Hilmoe how he came to that conclusion, the trial court sustained the objection.

In analyzing OMH's asserted need for evidence of the Chinese registration, we bear in mind that OMH offered other reasons why it had no choice but to agree to

10

continue a business relationship with Longfei that excluded Lakoda. They included the timing of the threatened termination of manufacture which came just as OMH was moving into its busiest sales season. OMH also contended Lakoda failed to obtain a nondisclosure agreement from Longfei until February 2011, well after Lakoda had already passed along the screener designs.

Mr. Zahang testified during his direct examination that the "2010. 4. 15" date he had written when he signed the Lakoda/Longfei nondisclosure agreement was not the date he actually signed it. CP at 281. Instead, he testified, the agreement, which he said was characterized to him by Peter as having something to do with quality control, was not presented to him until about six months after that date.

In closing argument, OMH's lawyer told the jury:

> *Longfei says we're going to build all the screeners that we can produce, and if you, OMH, don't buy it, we're going to sell [them] to someone else, and they put up OMH's own product on their own website, and they steal the website information from OMH and go into business for themselves.*
>
>     *So you might be asking yourselves, how can they do that?* Longfei had signed an NDA [nondisclosure] agreement. . . . [B]ut there's a lot of discrepancies to this, folks.
>
>     We've got an [agreement] effective July 9, 2010 that's signed on April 15, 2010, and you heard the testimony from Mr. Ames that he only obtained this NDA agreement in February of 2011 when Mr. Hilmoe asked him to give him a copy of it.
>
>     . . . .
>     We know that the NDA agreement [that] was signed . . . states it's effective July 9, 2010, but is dated April 15, 2011 [sic],[3] and then we have

---

[3] Presumably April 15, 2010.

11

the cryptic e-mail from Mr. Ames to Peter saying I need an NDA agreement for OMH, and it will relate back to some earlier agreement that Mr. Ames had with Peter.

Let's go back now to OMH. *The factory is competing with OMH for OMH's own products. OMH is told it can't build its product at any other factory in China.*

RP (May 15, 2014) at 121-23 (emphasis added).

On appeal, OMH renews its arguments that evidence of Longfei's registration of its screener designs was relevant and important to its defense to tortious interference and to whether it willfully and maliciously misappropriated a trade secret.

### 1. Relevance to defense to tortious interference

Evidence is only admissible if relevant. ER 402. Evidence is relevant if it has any tendency to make the existence of a fact of consequence more probable or less probable than it would be without the evidence. ER 401. A trial court's decision regarding relevancy will not be reversed absent an abuse of discretion. *State v. Suarez-Bravo*, 72 Wn. App. 359, 364, 864 P.2d 426 (1994).

The court instructed the jury that OMH and Mr. Hilmoe claimed that "even if their conduct interfered with Lakoda's prospective business relationship or future contract, that conduct was justified because they were acting reasonably to protect their financial interest from being harmed." CP at 1036 (Jury Instruction 28). It further instructed the jury:

> To establish the defense of financial interest, the Defendants have the burden of proving each of the following propositions:

12

> (1) That prior to any conduct of the Defendants interfering with a business relationship or future contract of Lakoda, Inc., the Defendants had a financial interest connected to Longfei; and
>
> (2) That the Defendants did not use wrongful means to protect that interest from harm.

*Id.*

An implicit jury finding, unchallenged by OMH, is that by entering into the agreement with Longfei that excluded Lakoda, OMH interfered with the Lakoda/Longfei nondisclosure agreement and the purchase orders expected to arise from it.

In defending, OMH was entitled to offer relevant, admissible evidence that its interference was privileged if it had acted, without using wrongful means, to protect an existing financial interest of its own. In that connection, it offered evidence of several reasons for its actions, including its evidence, alluded to in closing argument, that Mr. Hilmoe or Jack was told by Mr. Zahang that "Longfei was the only one that was allowed to manufacture screeners in China" and that Mr. Hilmoe understood he "no longer had control over [his] designs." 2 RP (May 7, 2014) at 307; 3 RP (May 8, 2014) at 540.

The court allowed OMH to offer this evidence of Longfei's bare assertion of its rights but excluded evidence of "registration" because OMH never pleaded the foreign law that would make information about "registration" meaningful to the jury. Evidence that is meaningless has no "tendency to make the existence of any fact that is of consequence more probable or less probable" as required for it to be relevant under ER 401.

13

No. 32616-1-III
*Lakoda, Inc. v. OMH Proscreen USA, Inc.*

Instead, OMH sought to inform the jury about "registration" through the testimony of a lay witness offering a lay understanding of its legal effect. But ER 701 provides that for a lay witness to testify to an opinion it must be rationally based on the witness's perception, helpful to a clear understanding of the witness's testimony or a fact in issue, and not based on scientific, technical, or other specialized knowledge. And even legal experts are not permitted to testify about issues of law, which is the province of the court. *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996).

OMH misreads the Washington decisions it cites as supporting its right to offer a lay witness's belief or understanding about the law.[4] And the Ninth Circuit decision it cites actually undercuts its position. In *Nationwide Transport Finance v. Cass Information Systems, Inc.*, the court affirmed the trial court's ruling that a businessman defending his company's alleged tortious interference could provide testimony "regarding why he believed [the plaintiff] *acted improperly* and why he believed *it was reasonable* to rescind [a] hold harmless agreement," but could not testify that the reason he thought he could rescind the agreement was his understanding or belief that the

_____

[4] *Skagit State Bank v. Rasmussen*, 109 Wn.2d 377, 745 P.2d 37 (1987) does not analyze, let alone hold, that a witness may testify to the legal effect of a document. *Bennett v. Shinoda Floral, Inc.*, 108 Wn.2d 386, 394, 739 P.2d 648 (1987) never discusses the plaintiffs' understanding of the legal effect of settlement releases they signed, but only whether a releasor "fairly and knowingly" releases claims when he knows he has been injured but does not know the extent or consequences of the injury.

14

plaintiff had violated the Uniform Commercial Code (U.C.C.). 523 F.3d 1051, 1060 (9th Cir. 2008) (emphasis added).

OMH was allowed to present equivalent evidence of what it contended was Lakoda's improper action and its reasonable response. The court properly sustained objections to OMH's efforts to present a lay witness's understanding of the legal landscape. Since the jury would have no basis for assessing the concept of registration or its consequences, the court did not abuse its discretion in finding evidence about registration to be irrelevant.[5]

### 2. Relevance to "willful and malicious" trade secret misappropriation

The Uniform Trade Secrets Act provides that "[i]f . . . willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party." RCW 19.108.040. The special verdict form asked jurors whether OMH's or Mr. Hilmoe's "misappropriation of a trade secret owned by Lakoda [was] willful and malicious," to which jurors answered yes. CP at 1060.

Only "malicious," not "willful," was defined for the jury. "Malicious" was defined as

---

[5] Although not argued on appeal and not the stated grounds for the trial court's exclusion of the registration, the evidence could also have been excluded under ER 403, based on its potential for confusing the issues or misleading the jury.

15

characterized by, or involving, malice, having, or done with, wicked or mischievous intentions or motives; wrongful and done intentionally without just cause or excuse.

CP at 1044 (Jury Instruction 33).

Evidence of registration was irrelevant here for the same reason it was irrelevant to OMH's affirmative defense to the tortious interference claim. Because OMH had not pleaded foreign law and could not inform the jury of the legal significance of registration through a lay witness, the jury would not know what "registration" meant. Evidence referencing it would have been meaningless.

The trial court did not abuse its discretion in sustaining Lakoda's objections to the registration evidence.

### B. Revisiting rulings following an "opened door"

OMH argues the trial court abused its discretion when it continued to sustain objections to evidence about registration after Lakoda examined witnesses about OMH's failure to take steps to protect its purported trade secret information, including the fact that OMH held no U.S. or Canadian patents. Lakoda's examination was relevant to its defense to OMH's trade secret claim and came in without objection. Whether information is a "trade secret" depends in part on whether it "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." RCW 19.108.010(4)(b).

As pointed out by Professor Tegland, there are two senses in which questioning a witness can be said to "open a door" and thereby waive evidentiary objections. One

16

sense is where a party introduces evidence of questionable admissibility itself. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 103.14 (5th ed. 2007). A second sense is where, by being the first to raise a subject matter at trial, a party invites the opposing party to explain, clarify or contradict its evidence. *Id.* at § 103.15, at 80. "Rules of evidence are designed to aid in establishing the truth," and refusing to allow a party to respond to a subject opened up by its adversary "might well limit the proof to half-truths." *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969). If questioning "opens the door" with *admissible* evidence in this second sense, it does not waive all objections to any evidence its adversary offers in response.

There is only one respect in which the trial court's continued exclusion of registration evidence arguably prevented OMH from explaining, clarifying or contradicting Lakoda's evidence about OMH's lack of effort to maintain the secrecy of its screener designs: it prevented OMH from trying to prove that once the Longfei factory registered the screener designs as its own, there was nothing OMH could do to protect itself from that particular compromise of secrecy. Outside the presence of the jury, OMH's lawyer made the following offer of proof:

> If Mr. Hilmoe were allowed to testify on the subject, he would be expected to offer evidence that he was given copies of the design registrations that were filed in China. Based on his investigation, he was of the belief that the Longfei factory owned the right to the OMH Proscreen brand collar designs in China, and that only Longfei could produce the screeners in China.

17

No. 32616-1-III
*Lakoda, Inc. v. OMH Proscreen USA, Inc.*

5 RP (May 13, 2014) at 861.

Here again, for reasons earlier stated, Mr. Hilmoe's lay belief about the legal effect of registration, including his apparent understanding that a wrongful registration could not be challenged, was inadmissible under ER 701. Other evidence concerning registration was irrelevant not because evidence that OMH tried to protect secrecy was irrelevant—*meaningful* evidence about efforts to protect secrecy *would be* relevant. Evidence concerning registration was irrelevant because without guidance on the legal effect of registration—which could come only from the court—"registration" was meaningless. The trial court did not abuse its discretion.

## II. Exclusion of videoclip and supporting deposition testimony

OMH conducted a perpetuation deposition of Gerald Clancy, one of the Canadians allegedly selling "knock off" screeners using OMH designs. On the trial day when lawyers read the deposition to the jury, the court entertained objections to portions of the deposition.

One of Lakoda's objections was to 5 questions and responses dealing with a 10-second videoclip the defendants had identified as their proposed Exhibit 330. The pertinent questions posed and answers given during the perpetuation deposition were:

Q.    . . . [D]o you recall as part of your prior deposition producing a document that was on a video of testing of one of the screeners?
A.    Yes, I do.
Q.    I want to show you a video. And this is marked as . . . . Defendants' D-330. . . . I'm going to go ahead and play this video for you.

18

CP at 622-23. OMH's lawyer then played the video twice for Mr. Clancy. The questioning continued:

> Q. Does that appear to be a correct copy of the video that you submitted in conjunction with your previous deposition?
> A. It appears to be.
> [OMH'S LAWYER]: Move to admit defendants' 330.
> [LAKODA'S LAWYER]: I'm going to object based on foundation and hearsay. And I haven't been provided a copy of that video so I'm going to reserve any right to object at the time [of] trial.
> [OMH'S LAWYER]: Q. Submitted as D-330.
> Do you recognize the individual that was testing that screener in that video?
> A. I do not.
> Q. You don't know if that is Peter G. or TG?
> A. I do not.

CP at 623.

Before the perpetuation deposition was read, Lakoda renewed its objection to a lack of foundation for admitting the videoclip and asked the court to exclude the related testimony. The court sustained the objection.

It is OMH's position that it needed to lay a two-part foundation for the videoclip: its relevance depended on the facts that (1) it was received by Mr. Clancy in connection with the "knock-off" screeners he was purchasing, and (2) it depicted Peter. OMH argues on appeal that the foundation it laid in the perpetuation deposition was sufficient for the limited purpose of establishing that the videoclip had been received by Mr. Clancy. As OMH's lawyer argued to the trial court when the objection was raised at trial, "The relevance is going to come later, Your Honor. We believe it depicts Peter Geng testing

19

this machine, and we have witnesses that will be able to identify him in that video." 5 RP (May 13, 2014) at 821.

ER 104(b) provides that when the relevancy of evidence depends on the fulfillment of a condition of fact, a trial court shall admit it either "upon, or subject to" the introduction of evidence sufficient to support a finding of the fulfillment of the condition. The rule gives the court discretion to either admit the primary evidence subject to connecting up, or to refuse to admit the primary evidence until its relevance is shown by the foundation evidence. TEGLAND, *supra*, § 104.6, at 126.

OMH challenges the trial court's ruling on appeal as if the court failed to provide it with the opportunity to "fulfill the condition" of relevance. But the trial court's actual reasoning was that the perpetuation deposition did not prove what OMH said it proved. As the court pointed out, at the perpetuation deposition Mr. Clancy testified only that he had submitted the videoclip in his previous deposition. He did not testify that the videoclip was one that he had received. OMH's lawyer admitted he would have to go back to Mr. Clancy's previous deposition to see if the testimony about receiving the videoclip was there. It was at that point that the court ruled,

> *At this point*, I don't see the relevance. I don't see it's been authenticated.
> So . . . I'm going to go ahead and strike that *at this time*.

5 RP (May 13, 2014) at 822 (emphasis added).

20

The clear implication of the trial court's ruling was that OMH was free to offer additional foundation later. But OMH did not thereafter seek to conditionally offer other deposition testimony and other witnesses to "connect up" relevance before offering the perpetuation deposition testimony and videoclip again.

The trial court did not abuse its discretion by excluding the deposition testimony and videotape at the time they were offered. The deposition testimony had not been shown to be relevant or even conditionally relevant.

### III. Denial of judgment as a matter of law: breach of contract

Paragraph 15 of the Lakoda-OMH nondisclosure agreement is a "Limitations on Liability" clause:

> Neither party shall be liable for special, indirect or consequential damages, or lost profits, arising out of or in connection with this Agreement, whether based on contract, tort, including negligence, or otherwise.

Ex. 5, at 3. At the close of Lakoda's case, OMH moved for judgment as a matter of law on its breach of contract claim, arguing Lakoda's only evidence of damages was of lost profits, liability for which is foreclosed by paragraph 15.

Lakoda responded that paragraph 15 is ambiguous in light of paragraph 8 of the agreement, captioned "Injunctive Relief," which acknowledges Lakoda's right to seek injunctive relief "in addition to [Lakoda's] other rights and remedies"—implying that Lakoda *has* other rights and remedies. Ex. 5, at 2. It argued that the contract would be illusory if it did not afford a right to sue for benefit of the bargain damages, which, given

21

No. 32616-1-III
*Lakoda, Inc. v. OMH Proscreen USA, Inc.*

the nature of the breach, were lost profits. Its final argument for ambiguity was that OMH had itself sued for damages for breach of the same agreement.

The court denied the motion for a directed verdict, deeming interpretation of the contract to be a question for the jury. In closing argument, OMH pointed out the limitation on liability clause to the jury. The jury still returned a verdict finding $250,000 in damages for the breach of contract claim.

Judgment as a matter of law is appropriate when no competent and substantial evidence exists to support a verdict. *Paetsch v. Spokane Dermatology Clinic, P.S.*, 182 Wn.2d 842, 848, 348 P.3d 389 (2015). In reviewing the denial of a CR 50 motion for judgment as a matter of law, all facts and reasonable inferences are construed in favor of the nonmoving party. *Yakima Fruit & Cold Storage Co. v. Cent. Heating & Plumbing Co.*, 81 Wn.2d 528, 530, 503 P.2d 108 (1972). We review the denial of such a motion de novo. *Schmidt v. Coogan*, 162 Wn.2d 488, 491, 173 P.3d 273 (2007), *aff'd*, 181 Wn.2d 661, 335 P.3d 424 (2014).

In Washington, the primary goal in interpreting a contract term is to ascertain the parties' intent at the time they executed the contract. *Paradise Orchards Gen. P'ship v. Fearing*, 122 Wn. App. 507, 516, 94 P.3d 372 (2004). And Washington cases hold that the intent of the parties to a particular agreement

> may be discovered not only from the actual language of the agreement, but also from "viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the

22

contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties."

*Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc.*, 120 Wn.2d 573, 580-81, 844 P.2d 428 (1993) (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990)).

When interpretation of a contract depends on the use of extrinsic evidence and more than one reasonable inference can be drawn from the extrinsic evidence, interpretation presents a question of fact, not law. *SAS America, Inc. v. Inada*, 71 Wn. App. 261, 857 P.2d 1047 (1993); RESTATEMENT (SECOND) OF CONTRACTS § 212(2) (1981).

Before moving for the directed verdict, OMH had cross-examined Mr. Ames about the meaning of the limitation of liability provision. In response to repeated questions, reflected over three pages of the transcript, Mr. Ames consistently responded that he was not sure what paragraph 15 of the nondisclosure agreement meant. In response to one of the last questions, "You don't have any idea what that means?" Mr. Ames responded:

> I know that the overall agreement as expressed to me and best articulated to me to OMH Proscreen was that I had protected information which I found necessary to protect, and that's why I asked them to sign the nondisclosure agreement with me prior to conducting business with them to protect my interest.

2 RP (May 7, 2014) at 349.

23

In closing argument, Lakoda's lawyer reminded the jury of the nondisclosure agreement's paragraph 8 with its reference to "other remedies" and said:

> Well, those two paragraphs have to be reconciled. It can't be interpreted so one doesn't have any impact at all. If you look at 15, the fair reading of it is that it doesn't make the nondisclosure agreement meaningless.
> The fair reading of it is that it's talking about consequential damages, incorrect [sic][6] damages of other business, not the business under the nondisclosure agreement. Otherwise, the nondisclosure agreement wouldn't mean a hill of beans.

RP (May 15, 2014) at 108-09.

Evidence at trial supported several factors that could make contract interpretation a question of fact. There was paragraph 8's reference to Lakoda's "other rights and remedies" (a contract is viewed "as a whole"). 3 RP (May 8, 2014) at 435. There was Lakoda's practice of requiring the contract at the very outset of a relationship to protect itself from being cut out of a manufacturing relationship (the subject matter and objective of the contract). There was the fact that Lakoda required the contract up front in its dealings with OMH (all "the circumstances surrounding the making of the contract"). CP at 1011. There was the fact that OMH was asserting its own breach of contract claim ("the subsequent acts and conduct of the parties"). CP at 300. There was Mr. Ames's testimony that he did not know what paragraph 15 meant.

---

[6] Presumably "indirect."

As to the reasonableness of the parties' respective interpretations, Lakoda's contention that paragraph 15 was intended to exclude only indirect and consequential harm to the nonbreaching party's relationships with third parties is not unreasonable. The limitation looks like one more likely to be found in contracts Lakoda would use for sales of goods. *Cf.* RCW 62A.2-719(1) (permitting limitation of damages in Article 2 sales to, e.g., return of goods and repayment of the price to repair and replace nonconforming goods); U.C.C. § 2-719 cmt. 1 ("However, it is of the very essence of a sales contract that at least minimum adequate remedies be available.").

If the intent was to limit only these attenuated damages, the provision could have been more clearly written, to be sure. But OMH's interpretation—that the parties intended to foreclose all remedies other than injunctive relief—fails under every nontextual factor we apply in interpreting contracts.

Over 25 years ago, our Supreme Court disapproved the "plain meaning rule['s]" application to contract interpretation and adopted the context rule. *Berg*, 115 Wn.2d at 671. Under the context rule, the interpretation of the parties' nondisclosure agreement

25

presented a question of fact, not law.[7, 8]

### IV. Denial of judgment as a matter of law: trade secret misappropriation

OMH also challenges the trial court's denial of its CR 50 motion to dismiss

Lakoda's trade secret misappropriation claim. It contends Lakoda had not presented

sufficient evidence of a trade secret or, if a trade secret existed, that it was *Lakoda*'s trade

secret. Again, we review de novo whether Lakoda's evidence was insufficient to support

a verdict in its favor.

Washington law provides remedies to parties harmed by misappropriation of their

trade secrets. RCW 19.108.020-050. Lakoda's position was that its contacts in China,

the factories it had identified and developed working relationships with, and its

knowledge of methods for working with factories and manufacturers in China were its

trade secrets.

---

[7] In its reply brief, OMH argues the contract should have been construed against Lakoda. The principle that a contract may be construed against the drafter applies only if the context rule has been applied and the contract still remains ambiguous. *Forest Mktg. Enters. Inc. v. Dep't Nat. Res.*, 125 Wn. App. 126, 132-33, 104 P.3d 40 (2005) (citing *Roberts, Jackson & Assoc. v. Pier 66 Corp.*, 41 Wn. App. 64, 69, 702 P.2d 137 (1985)). It is a possible matter of instruction to the jury, but since it applies to only ambiguous contracts it has no application where we are being asked following a jury trial to decide that the contract had a clear meaning as a matter of law.

[8] On appeal, Lakoda also argues that even if the interpretation proposed by OMH is correct, it would not matter because a limitation on liability is excused when the breaching party acted in bad faith. The jury was not asked to determine whether OMH breached the contract in bad faith, however, and we do not view its finding of a willful and malicious trade secret violation as a substitute for instruction and finding on a distinct contract issue.

Lakoda presented testimony that it would be difficult for someone to work with a factory in China if they had not done so before, and testimony explaining why. Mr. Ames testified to the tremendous amount of time Lakoda spent locating and investigating factories. Lakoda presented evidence that Mr. Ames visited the Longfei factory a number of times in order to assess, among other things, what equipment was available, what the manufacturing process was, what quality checks were in place, and what communication barriers might exist. Mr. Ames testified he had worked with Longfei for years. Evidence was presented that OMH had encountered problems with its prior manufacturing relationship in China and, notwithstanding OMH's contention that Chinese factories could be searched for on the Internet, it had elected to find its next manufacturer with the assistance of Lakoda and signed a nondisclosure agreement in order to do so.

Because the evidence established that Lakoda often worked with and through Peter and TPD, OMH argues, "If the Longfei factory was a trade secret, it was TPD's trade secret." Br. of Appellant at 41. But it cites no legal authority that working through agents prevents a person from having trade secrets.

The Uniform Trade Secrets Act defines "trade secret" as

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by

proper means by, other persons who can obtain economic value from its disclosure or use; and

(b)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW 19.108.010(4). The definition does not exclude information obtained through agents. The evidence presented by Lakoda was sufficient to support a jury verdict that the Longfei factory and methods of working with it was Lakoda's trade secret.

### V. Sufficiency of evidence on damages

OMH challenges the damage award, alleging the jury's award is not supported by "sufficient and accurate" evidence. Br. of Appellant at 30.

Lakoda presented its evidence on damages through Mr. Ames. He first identified an exhibit that was a collection of invoices from Lakoda to OMH and an exhibit that was a collection of purchase orders Lakoda had placed with TPD. He testified that the collections of invoices and purchase orders would reflect, respectively, all of Lakoda's costs of goods sold to OMH and all of Lakoda's revenue received from OMH, with the difference being Lakoda's gross profit. He also identified exhibits that had been prepared to summarize information from the invoices and purchase orders that was relevant to Lakoda's calculation of its damages. Lakoda offered the summaries under ER 1006.

OMH objected to the first summary offered, Exhibit 16, on the basis that one type of entry was an "average unit price" rather than a figure actually reflected on the underlying documents. 1 RP (May 6, 2014) at 112. The trial court overruled the

28

objection and the summary was admitted into evidence. When other summaries that were even more key to Lakoda's damage claim were offered thereafter, OMH indicated that they were "subject to the same objection." *See* 1 RP (May 6, 2014) at 140-42 (offer and admission of Ex. 126).

OMH now challenges the trial court's ruling admitting several of the summaries, arguing they were not accurate.

ER 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." The rule requires that the summary and the originals be made available at a reasonable time and place. No challenge was made at trial to Lakoda's representation that its summaries and underlying documents were made available to OMH before trial.

Relying on case law holding that the proponent of a summary offered under ER 1006 must show that it is "accurate," OMH identifies three alleged errors in the summaries. But only one of the alleged errors was raised as an objection when the summaries were offered. That objection was to the inclusion of an average unit price in exhibit 16. While the average unit price did not itself appear on the summarized documents, it was derived from them, and its correctness or incorrectness could be determined from them. It fell within the rule's authorization to present the contents of voluminous documents "in the form of a . . . calculation."

29

OMH's other objections come too late.[9] Lakoda laid the required foundation of accuracy. *See* 1 RP (May 6, 2014) at 111-12, 142 ("Q. Is this an accurate summary of the information contained in Exhibit 18? A. Yes."; "Q. Do you believe that this is an accurate summarization of the information contained within Exhibit 128? A. Yes, I do."). The foundation requirement is not a guarantee of accuracy. *See Fidelity Nat. Title Ins. Co. v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 753 (7th Cir. 2005) ("[T]he fact that [summaries] *might* be inaccurate is not a ground for excluding them.") The reason the rule requires advance production of the summarized documents is so that an adversary can spot check the summary for accuracy and, should it reveal inaccuracies, "have solid grounds for moving to exclude [the summary] from the trial unless the inaccuracies were promptly corrected." *Id.*

OMH's identification for the first time on appeal of asserted errors in the summaries admitted into evidence is no basis for setting aside the damages awarded. "A strong presumption exists in Washington that a jury's determination of the amount of damages to be awarded is valid." *Palmer v. Jensen*, 81 Wn. App. 148, 150, 913 P.2d 413 (1996). An appellate court will generally not disturb a jury's verdict on damages if the verdict is within the range of the evidence presented at trial. *Steele v. Queen City Broad.*

---

[9] They also depend on exhibits 126 and 128, neither of which was designated as part of the record on appeal.

*Co.*, 54 Wn.2d 402, 409, 341 P.2d 499 (1959). OMH presents no basis for disturbing this verdict.

## VI. Attorney fees

Finally, OMH challenges the trial court's award of attorney fees to Lakoda. It argues the court abused its discretion when it awarded fees because: (1) Lakoda only recovered a nominal award on the trade secret claim, (2) the award did not segregate time spent on claims for which Lakoda was not entitled to recover fees, and, (3) the final award included hours spent to recover fees and the costs of a court reporter at Mr. Hilmoe's depositions.

Lakoda was awarded reasonable attorney fees under RCW 19.108.040, which provides that "[i]f . . . willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."

"This court reviews the reasonableness of attorney fees awards under an abuse of discretion standard." *Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 665, 989 P.2d 1111 (1999). A trial court abuses its discretion if its award is manifestly unreasonable or based on untenable grounds. *Id.* "The trial court's discretion is not unbridled" and the Washington State Supreme Court has overturned attorneys fee awards when it "disapproved of the method utilized by the trial court" to calculate an award. *Progressive Animal Welfare Soc. v. Univ. of Wash.*, 114 Wn.2d 677, 689, 790 P.2d 604 (1990).

31

### A. "Nominal" award

OMH first argues that because Lakoda was only awarded nominal damages on its trade secret claim, the court abused its discretion when it awarded Lakoda fees and costs in the amount of $231,441.78. It cites *Farrar v. Hobby*, in which the United States Supreme Court held that in a civil rights case, a prevailing party who receives an award of nominal damages may not be entitled to a recovery of fees and costs. 506 U.S. 103, 111-12, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992); *see also Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640, 664-65, 935 P.2d 555 (1997). Still, "*Farrar* does not set forth a per se rule that attorney's fees are improper when only nominal damages are obtained." *Ermine v. City of Spokane*, 143 Wn.2d 636, 644, 23 P.3d 492 (2001). And this is not a Section 1983 case.

Most persuasive to us is the overlapping nature of the claims and the implausibility that the jury believed Lakoda suffered only $1 in damages from trade secret misappropriation. The jurors were instructed that Lakoda had the burden on its trade secret claim of proving "[t]hat Defendants' misappropriation was a proximate cause of damages to Lakoda, Inc., or as a result of the misappropriation Defendants received money or benefits that in justice and fairness belong to Lakoda, Inc." CP at 1026. In completing the special verdict, the jury not only found misappropriation, it separately found that the misappropriation was willful and malicious. OMH points us to no

32

evidence presented during the trial that would explain $1.00 in damages resulting from the misappropriation.

We agree with the trial court that it appears the jurors were heeding the court's instruction that they "should not duplicate the damages in your award." CP at 1059; *cf. Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1430 (D. Kan. 1987), (rejecting defense argument that a punitive damage award could not stand where jurors awarded only $1.00 in damages for the underlying claim; "[v]iewing all the facts of this case and the jury instructions in their entirety, the verdict can only be understood as the jury's conclusion [that plaintiff] suffered in excess of one and a half million dollars of damages as a direct consequence of defendant's conduct violating both the antitrust laws of the United States and the tort law of the State of Kansas."), *aff'd in part*, 899 F.2d 951 (10th Cir. 1990).

We doubt the jury viewed Lakoda's damage from the trade secret misappropriation as nominal and even if it did, the trial court would have discretion to award the fees. *Ermine*, 143 Wn.2d at 650 (emphasizing the deferential abuse of discretion standard applied in reviewing a court's decision to grant or deny attorney fees in a nominal damages case). We find no abuse of discretion.

### B.  Segregation

OMH next argues the trial court abused its discretion because it did not segregate

33

the time Lakoda spent on the breach of contract claim or OMH's counterclaims from the misappropriation claim.

To calculate an attorney fee award, a court multiplies the number of hours reasonably expended by the reasonable hourly rate. *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 538, 151 P.3d 976 (2007). The court should discount hours spent on unsuccessful claims, duplicated or wasted effort, or otherwise unproductive time. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983). "[H]ours reasonably expended must be spent on claims having a 'common core of facts and related legal theories,'" to those for which the party is entitled to recover. *Chuong Van Pham*, 159 Wn.2d at 538 (quoting *Martinez v. City of Tacoma*, 81 Wn. App. 228, 242-43, 914 P.2d 86 (1996)).

Lakoda's lawyers provided its billing statements to the court and a representation of the amount they believed reflected efforts enabling them to prevail on the trade secret claim. They acknowledged the work related to other claims, but all involved a common core of fact and were not easily segregated. They reduced the fees by 14 percent, an amount they believed was a reasonable adjustment for duplicate billing.

The court found that the claims were "intertwined," and explained that after going through the supporting billing information it believed the 14 percent reduction was fair. RP (June 27, 2014) at 20-21.

34

> There may be some overlapping. As I went through and looked at those, I was trying to figure out how to tally and calculate them. Mr. Roberts agreed he would take a percentage off even what he figured to make sure that it stays fair. To the Court, that seems like a very reasonable way.

*Id.*

This is a case in which there was a substantial overlap of conduct relevant to each of Lakoda's claims. And because of OMH's "financial interest" defense to trade secret misappropriation, the disputes of fact over OMH's own situation and course of action became relevant to prevailing on the trade secret claim. The trial court considered the overlap and was in the best position to assess and account for it. OMH has not provided us with any basis for finding the 14 percent discount manifestly unreasonable.

### C. Fees-on-fee fights and deposition costs

Finally, OMH argues the court abused its discretion when it awarded Lakoda fees for the time spent arguing the attorney fees motion and court reporter costs for Mr. Hilmoe's deposition. Of the $231,441 awarded in fees, $8,600 were incurred arguing the fee motion. OMH does not identify the amount of costs associated with the depositions of Mr. Hilmoe.

"As a general rule, fees incurred while litigating an entitlement to fees are recoverable under remedial statutes." *Johnson v. Dep't of Transp.*, 177 Wn. App. 684, 695 n.7, 313 P.3d 1197 (2013) (citing *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 378, 798 P.2d 799 (1990)). OMH nonetheless complains that Lakoda waited

until it filed its reply brief on the fee motion to raise its request for fees incurred in seeking fees. OMH had the opportunity to voice its objections to the additional fees when the motion on the fee award was heard, however, and does not claim to have requested and been denied a continuance. The trial court did not abuse its discretion in awarding fees based on the supplemental request.

As to deposition costs, the trial court awarded the entire cost of the court reporter in attendance at Mr. Hilmoe's several depositions. With the benefit of a transcript of trial at this point, OMH contends only three pages of the Hilmoe deposition were used at trial. It counts only pages 566, 573, and 574 of the Report of Proceedings (5 RP (May 8, 2014)), on which Mr. Hilmoe is impeached with his deposition. It is obvious from the transcript, however, that Lakoda's lawyer used the depositions to keep Mr. Hilmoe on a short leash throughout his cross-examination. Impeachment only happened when Mr. Hilmoe strayed.

At the time it ruled on the fee award, the trial court did not have the trial transcript, but only Lakoda's lawyers' recollection that the depositions were used extensively, OMH's lawyers' recollection that they were not used extensively, and its own recollection. It entered a finding that "[d]uring trial, the depositions sought as costs were used extensively." CP at 1171.

Under RCW 4.84.010(7), a party may recover a reasonable expense for the transcription of depositions used at trial "[t]o the extent that the court . . . finds that it was

36

necessary to achieve the successful result . . . PROVIDED, That the expenses of depositions shall be allowed on a pro rata basis for those portions of the depositions introduced into evidence or used for purposes of impeachment." In other words, a cost award for portions of a deposition used for impeachment is a floor, below which the court may not go. It is not a cap. Cases have upheld an award of the costs of depositions where they are used at trial "during cross-examination *and* for impeachment purposes," and even where they are successfully used in procuring a summary judgment. *Payne v. Paugh*, 190 Wn. App. 383, 414, 360 P.3d 39 (2015) (emphasis added). The court did not abuse its discretion in awarding the depositions' cost.

## Attorney fees on appeal

Lakoda seeks an award of its reasonable attorney fees and costs on appeal under RCW 19.108.040 and RAP 18.1. As the prevailing party, Lakoda has the right to recover reasonable fees and costs incurred in this appeal that are associated with its trade secret claim. They are awarded subject to Lakoda's compliance with RAP 18.1(d).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

No. 32616-1-III
*Lakoda, Inc. v. OMH Proscreen USA, Inc.*

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Fearing, C.J.